1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

STEPHEN J. TUTTLE, et al.,                      CASE NO. C22-1081JLR

11                                Plaintiffs,    ORDER GRANTING
                                                PRELIMINARY APPROVAL OF
12          v.                                   CLASS ACTION SETTLEMENT

13   AUDIOPHILE MUSIC DIRECT
     INC., et al.,

14
                                  Defendants.
15

16                          I.      INTRODUCTION

17          Before the court is Plaintiffs Stephen J. Tuttle and Dustin Collman's (collectively,

18   "Plaintiffs") motion for preliminary approval of their class action settlement with

     Defendants Audiophile Music Direct, Inc. and Mobile Fidelity Sound Lab Inc.
19
     (collectively, "Defendants").  (Mot. (Dkt. # 26); Pls Reply (Dkt. # 39); Defs Reply (Dkt.
20
     # 41).)  Intervenors Adam Stiles, Omar Flores, and Gregory Bitterman (collectively,
21
     "Intervenors") oppose the motion.  (Resp. (Dkt. # 37).)  The court has considered the
22

1   motion, all materials filed in support of and in opposition to the motion, the relevant

2   portions of the record, and the governing law.  Being fully advised,[1] the court GRANTS

3   Plaintiffs' motion for preliminary approval of the class action settlement.

## II.    BACKGROUND

5           Defendants are producers and sellers of vinyl music recordings.  (Am. Compl.

6   (Dkt. # 14) ¶ 1.)  One of their product lines, according to Plaintiffs, "consists of analog

7   recordings that are made without the use of digital processing, i.e., by duplicating the

8   original analog master recordings using only analog processes."  (*Id.*)  Plaintiffs assert

9   that recordings made without a digital processing step are "highly valued by high-end

10  audiophiles and collectors."  (*Id.*; *see also id.* ¶ 21 (explaining that audiophiles believe

11  that analog recordings "preserve the entire dynamic range of the sound that has been

12  recorded, whereas digital recording limits or compresses the signal in a way that limits

13  the dynamic range").)  As a result, Plaintiffs allege, Defendants were able to charge a

14  "high premium" for recordings that they claimed were produced without a digital

15  processing step.  (*Id.* ¶¶ 22-24.)  These recordings were produced under processes

16  Defendants refer to as "Original Master Recording" ("OMR") or "Ultradisc One-Step"

17  ("One-Step").  (*Id.* ¶ 3.)

---

19     [1] The parties and Intervenors agree that the court can and should decide this motion and
20  the question, discussed below, of whether the proposed settlement is the product of a "reverse
    auction" on the papers rather than in an evidentiary hearing.  (Resp. at 6; Pls. Reply at 1; Defs.
    Reply at 7; *see* 3/13/23 Order (Dkt. # 36) at 14 (directing the parties and Intervenors to include in
21  their briefing "a proposal for the process the court should use to resolve the question of whether
    the class settlement in this action was the result of a 'collusive reverse auction'").)  Having
22  reviewed the parties' and Intervenors' submissions, the court agrees that this matter can be
    decided without a hearing.  *See* Local Rules W.D. Wash. LCR 7(b)(4).

1   Plaintiffs allege that Defendants represented that many of these recordings were

2 produced using analog-only processes when, in fact, they were not.  (*Id.* ¶ 2; *see also id.*

3 ¶ 27 (quoting a July 27, 2022 statement in which Defendants' president, James Davis,

4 acknowledged that Defendants had used digital technology in their mastering chain).)

5 Approximately 123 OMR and One-Step recordings that Plaintiffs allege Defendants had

6 represented were analog-only but in fact were produced using a digital processing step

7 are at issue in this litigation (the "Applicable Records").  (1/15/23 Davis Decl. (Dkt. # 19)

8 ¶ 3; *id.* ¶ 6, Ex. A (listing the Applicable Records).)  Plaintiffs assert, on behalf of

9 themselves and proposed Washington and nationwide classes, that they reasonably relied

10 on Defendants' representations that the Applicable Records were produced using

11 analog-only processes, purchased the recordings either directly from Defendants or from

12 third-party retailers in reliance on those representations, and suffered damage as a result.

13 (*Id.* ¶¶ 2, 30.)  Defendants' sales records indicate that they sold over 634,000 Applicable

14 Records between 2007 and July 27, 2022.  (1/15/23 Turner Decl. (Dkt. # 18) ¶ 2.)

15 Defendants sold approximately 25% of the Applicable Records directly to retail

16 customers, and the remaining 75% to other retailers such as Target and Walmart.  (*Id.*)

17   Plaintiffs filed this action on August 2, 2022.  (Compl. (Dkt. # 1).)  Between

18 August 18 and September 23, 2022, other sets of plaintiffs filed separate proposed class

19 actions against Defendants in the Northern District of Illinois, the Central District of

20 California, and the Northern District of California.  *See Stiles v. Mobile Fidelity Sound*

21 *Lab, Inc.*, Case No. 1:22-cv-04405 (N.D. Ill.) (filed August 18, 2022); *Bitterman v.*

22 *Mobile Fidelity Sound Lab, Inc.*, Case No. 1:22-cv-04714 (N.D. Ill.) (filed September 1,

1  2022); *Allen v. Audiophile Music Direct*, Case No. 2:22-cv-08146 (C.D. Cal.) (filed

2  September 22, 2022, in Los Angeles County Superior Court before being removed to

3  federal court); *Molinari v. Audiophile Music Direct*, Case No. 4:22-cv-05444 (N.D. Cal.)

4  (filed September 23, 2022).  Thus, this case is the first-filed action challenging

5  Defendants' alleged representation of the OMR and One-Step recordings as analog-only

6  when those recordings were in fact produced using a digital processing step.

7       Plaintiffs originally moved for preliminary approval of the parties' class action

8  settlement on January 15, 2023.  (1/15/23 Mot. (Dkt. # 17).)  On January 20, 2023, the

9  court denied the motion without prejudice; directed Plaintiffs to correct several issues the

10  court had identified in Plaintiffs' preliminary approval materials; and granted Plaintiffs

11  leave to submit revised materials with a renewed motion for preliminary approval.

12  (1/20/23 Order (Dkt. # 21).)  Plaintiffs filed the instant revised motion and amended

13  settlement agreement ("Amended Settlement Agreement") on January 31, 2023.  (Mot.;

14  2/2/23 Turner Decl. (Dkt. # 28) ¶ 2, Ex. 1 ("Am. Agreement").)

15       The parties' proposed settlement class (the "Class") is comprised of:

16      All original retail consumers in the United States who, from March 19, 2007,
   through July 27, 2022 purchased, either directly from a Defendant or other

17      retail merchants, new and unused Mobile Fidelity Sound Lab, Inc. ("MoFi")
   vinyl recordings which were marketed by Defendants using the series

18      labeling descriptors "Original Master Recording" and/or "Ultradisc One-
   Step," that were sourced from original analog master tapes and which utilized

19      a direct stream digital transfer step in the mastering chain, and provided that
   said purchasers still own said recordings (the "Applicable Records").

20      Excluded from the Class are persons who obtained subject Applicable
   Records from other sources.

21

22

(Am. Agreement ¶ 4.28.)  Individuals who no longer own the Applicable Records they purchased are expressly excluded from the Class.  (*Id.*)  Defendants estimate that the Class will include approximately 20,000 people who purchased Applicable Records directly from Defendants and at least the same number who purchased Applicable Records from other retailers.  (1/15/23 Davis Decl. ¶ 4.)

Plaintiffs' research indicates that "most, if not all" of the Applicable Records that have been cared for properly have a value on the secondary market that exceeds their original purchase price.  (1/15/23 Turner Decl. ¶ 4; 3/31/23 Turner Decl. (Dkt. # 40) ¶ 3.) Therefore, the parties' proposed settlement offers Class members their choice of three forms of relief.  Class members who wish to return their Applicable Records may choose to receive a full refund of the price they paid for their Applicable Records, plus tax and shipping.  (Am. Agreement ¶ 5.1(a).)  Class members who wish to keep their Applicable Records may choose either a refund of 5% of the price they paid for their Applicable Records, plus tax and shipping, or a coupon for 10% of the price they paid for their Applicable Records, plus tax and shipping, that can be redeemed for any products offered on Defendants' Music Direct website.  (*Id.* ¶¶ 5.1(b)-(c).)  Coupons expire 180 days after issuance and are not transferable; a Class member may, however, combine the value of multiple coupons when making a purchase on Defendants' website.  (*Id.* ¶ 5.1(c).)  Class members who purchased multiple Applicable Records may select among the three forms of relief for each record—for example, a Class member may choose to receive a full refund for one record and a coupon for another.  (*Id.* ¶ 5.1(d).)  Class members must show both proof of purchase and proof of ownership of their Applicable Records to

1   receive a refund or coupon.  (*Id.* ¶¶ 4.23, 4.24, 5.1.)  In exchange, Class members agree

2   to release Defendants from any claims, known or unknown, which "arise out of or are in

3   any way related to Defendants' marketing, promotion, and sale of the Applicable

4   Records" between March 19, 2007, and July 17, 2022, or which could have been raised in

5   this litigation related to the Applicable Records.  (*Id.* ¶¶ 4.1, 4.26, 4.33, 5.6.)

6        The parties propose a notice program that includes (1) sending the full notice and

7   claim forms by U.S. Mail and the summary notice by email to approximately 23,000

8   individuals who purchased Applicable Records directly from Defendants; (2) publishing

9   notice on Defendants' websites and on industry and audiophile online forums, websites,

10  and print media; and (3) targeted advertising on social media.  (*Id.* ¶¶ 5.3.2, 5.3.3;

11  Finegan Decl. (Dkt. # 27) ¶¶ 4-5, 14-26; *see also* Am. Agreement, Exs. C & D (summary

12  notice and full notice).)  The proposed Settlement Administrator, Kroll Settlement

13  Administration LLC, ("Settlement Administrator") will also create a website to enable

14  Class members to electronically submit proofs of purchase and ownership of their

15  Applicable Records.  (Am. Agreement ¶ 5.3.4.)  Class members who chose to receive a

16  5% refund or 10% coupon will receive their compensation within 30 days of the

17  expiration of the period to appeal or the completion of any appeals of the final approval

18  of the settlement agreement.  (*Id.* ¶ 5.5.1.)  Class members who chose to return their

19  Applicable Records will receive a pre-paid return shipping label and return instructions at

20  the same time.  (*Id.* ¶ 5.5.2.)

21       Plaintiffs will ask the court to approve a service award of $10,000 for each of the

22  two named Plaintiffs.  (*Id.* ¶ 5.7.2.)  They will also request an award of attorneys' fees

1    and costs of no more than $290,000.  (*Id.* ¶ 5.7.1.)  Attorneys' fees and service awards

2    will be paid directly by Defendants, and Defendants will bear all expenses and costs

3    arising from the administration of the settlement.  (*Id.* ¶¶ 5.3.8, 5.7.1, 5.7.2, 5.8.)

4         On March 13, 2023, the court granted Intervenors' motion to intervene in this

5    action for the limited purpose of opposing Plaintiffs' revised motion for preliminary

6    approval of the class settlement and granted Plaintiffs and Defendants leave to file

7    optional replies in support of Plaintiffs' motion.  (3/13/23 Order.)  Plaintiffs' revised

8    motion for preliminary approval is now ripe for decision.

9                                    **III.    ANALYSIS**

10        Intervenors oppose the *Tuttle* parties' motion for preliminary approval because,

11   they argue, the parties' proposed settlement (1) was the product of a collusive "reverse

12   auction" and (2) provides inadequate relief to the class.  (*See generally* Resp.)  Below, the

13   court sets forth the standard of review for preliminary approval of a class settlement;

14   considers Intervenors' arguments against the parties' proposed settlement; and evaluates

15   the factors that guide preliminary approval of a class action settlement under Federal

16   Rule of Civil Procedure 23(e)(1).

17   **A.    Standard of Review**

18        In order for the court to preliminarily approve a class settlement and to direct that

19   notice to be sent to class members, the parties must show that the court "will likely be

20   able to (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes

21   of judgment on the proposal."  Fed. R. Civ. P. 23(e)(1)(B).  The court's focus at the

22   preliminary approval stage is on whether the proposed settlement "appears to be the

1  product of serious, informed, non-collusive negotiations, has no obvious deficiencies,

2  does not improperly grant preferential treatment to class representatives or segments of

3  the class, and falls within the range of possible approval.'" *LSIMC, LLC v. Am. Gen. Life*

4  *Ins. Co.*, No. 2:20-cv-11518-SVW-PVC, 2023 WL 2628106, at *1 (C.D. Cal. Feb. 16,

5  2023) (quoting *Chen v. Chase Bank USA, N.A.*, No. 19-cv-01082-JSC, 2020 WL 264332,

6  *6 (N.D. Cal. Jan. 16, 2020)).

7  　　　　Rule 23(e)(2) requires the court to evaluate whether the parties' settlement

8  proposal is "fair, reasonable, and adequate" after considering four enumerated factors.

9  Fed. R. Civ. P. 23(e)(2).  If the court has not previously certified the class, it must also

10  consider whether the class should be conditionally certified for settlement purposes.  *See*

11  Fed. R. Civ. P. 23(e)(1)(B)(ii).  Plaintiffs must also, therefore, demonstrate to the court

12  that the settlement class is likely to satisfy "each of the four requirements of Rule 23(a)—

13  numerosity, commonality, typicality, and adequacy—and at least one of the requirements

14  of Rule 23(b)."  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017).

15  **B.     Rule 23(e)(2) Factors**

16  　　　　The court begins by preliminarily reviewing the Rule 23(e)(2) factors to determine

17  whether the parties have shown that the court is likely to approve their proposal.  Fed. R.

18  Civ. P. 23(e)(1)(B)(i).  The court must consider whether "(A) the class representatives

19  and class counsel have adequately represented the class; (B) the proposal was negotiated

20  at arm's length; (C) the relief provided for the class is adequate . . . and (D) the proposal

21  treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2).

22

1        <u>1.</u>    <u>Adequacy of Representation and Arm's Length Negotiation</u>

2        Rules 23(e)(2)(A) and 23(e)(2)(B) require the court to evaluate whether "the class

3 representatives and class counsel have adequately represented the class" and whether "the

4 proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(A)-(B). Intervenors

5 argue that the court must deny preliminary approval of the parties' settlement because the

6 settlement was the result of a collusive reverse auction. (Resp. at 3-6.) "A reverse

7 auction is said to occur when 'the defendant in a series of class actions picks the most

8 ineffectual class lawyers to negotiate a settlement with in the hope that the district court

9 will approve a weak settlement that will preclude other claims against the defendant.'"

10 *Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1099-1100 (9th Cir. 2008)

11 (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002)). In a

12 reverse auction,

13        [t]he ineffectual lawyers are happy to sell out a class they anyway can't do
much for in exchange for generous attorneys' fees, and the defendants are

14        happy to pay generous attorneys' fees since all they care about is the bottom
line—the sum of the settlement and the attorneys' fees—and not the

15        allocation of money between the two categories of expense.

16 *Reynolds*, 288 F.3d at 283; *see Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*,

17 874 F.3d 692, 697 (11th Cir. 2017) (finding a potential reverse auction where the record

18 included emails "that showed that the plaintiffs' counsel was engaged in a

19 'Machiavellian' plan to undercut the movants' negotiating position.").

20        Those challenging a settlement as resulting from an alleged reverse auction must

21 provide "concrete evidence" of collusion. *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314

22 F.3d 1180, 1189 (10th Cir. 2002). Otherwise, the "reverse auction argument would lead

1   to the conclusion that no settlement could ever occur in the circumstances of parallel or

2   multiple class actions—none of the competing cases could settle without being accused

3   by another of participating in a collusive reverse auction." *Negrete*, 523 F.3d at 1100

4   (quoting *Rutter*, 314 F.3d at 1189).

5        The court preliminarily concludes that the *Tuttle* parties' proposed settlement lacks

6   the hallmarks of a reverse auction recognized in the case law:  ineffectual lawyers,

7   evidence that the defendant negotiated with those lawyers *because of* their supposed

8   ineffectiveness, and overly generous attorneys' fees compared to the relief offered to the

9   class.  *See Negrete*, 523 F.3d at 1099-1100; *Reynolds*, 288 F.3d at 283.

10       First, lead counsel for Plaintiffs, Duncan C. Turner, and his firm have a record of

11  effective class action advocacy.  Mr. Turner has successfully settled 21 cases in the past

12  six years for a total recovery of over $36 million.  (3/31/23 Turner Decl. ¶ 4; *see also*

13  1/15/23 Turner Decl. ¶¶ 9-11 (describing Mr. Turner's legal background).)  His law firm,

14  Badgley Mullins Turner, has acted as co-counsel in numerous class actions and

15  shareholder derivative cases since 2007.  (1/15/23 Turner Decl. ¶¶ 12-13.)  Intervenors do

16  not rebut Mr. Turner's representations regarding his experience or that of his firm.  (*See*

17  *generally* Resp.)  The court cannot conclude, based on this record, that Plaintiffs' counsel

18  are ineffectual.

19       Second, there is no evidence that Defendants chose to negotiate with Plaintiffs'

20  counsel *because of* counsel's alleged ineffectiveness.  To the contrary, the record shows

21  that Defendants' counsel negotiated with Plaintiffs' counsel because this case was the

22  first of the five proposed class actions regarding the Applicable Records to be filed.  *See,*

*e.g.*, *Rahman v. Gate Gourmet, Inc.*, No. 3:20-cv-03047-WHO, 2021 WL 5973046 (N.D. Cal. Nov. 22, 2021) ("Usually, considerations of efficiency, economy, and avoiding duplicative litigation give favor to the first-filed case." (citing *Barapind v. Reno*, 225 F.3d 1100, 1109 (9th Cir. 2000)).  Plaintiffs filed this case on August 2, 2022; Mr. Turner and Defendants' lead attorney, Joseph J. Madonia, had a first conversation on August 18, 2022; and the parties began their negotiations on August 22, 2022, before Defendants learned about any of the later-filed competing class actions.  (Compl.; 2/13/23 Madonia Decl. (Dkt. # 33-1) ¶ 5 (stating that counsel for Plaintiffs and Defendants had an initial conversation on August 18, 2022); 2/13/23 Turner Decl. (Dkt. # 32) ¶ 4 (same); 3/31/23 Madonia Decl. (Dkt. # 41-2) ¶ 4 (stating that negotiations with Plaintiffs began on August 22, 2022); *id.* ¶ 4, Ex. 1 (August 22, 2022 email from Mr. Turner to Mr. Madonia, acknowledging that the parties had "engaged in preliminary discussions towards resolving the case").)  Meanwhile, *Stiles* was not filed until August 18, 2022; *Bitterman* was not filed until September 1, 2022; and Defendants were not served with those cases until August 31, 2022, and September 19, 2022, respectively.  (3/31/23 Davis Decl. (Dkt. # 41-1) ¶ 12; 3/31/23 Madonia Decl. ¶ 4.)  In addition, Intervenors' assertion that Defendants' counsel "shopped" the case in an effort to find the most ineffectual lawyers and the lowest settlement is belied by the fact that there is no evidence that Defendants' counsel engaged in *any* settlement discussions with counsel in the two California class actions.  (*See* 3/31/23 Madonia Decl. ¶ 10 (stating that Defendants' counsel never discussed, exchanged, or negotiated settlement terms with counsel for the plaintiffs in the four later-filed actions).)

1    Third, the attorneys' fees Plaintiffs will request do not appear to be

2    overly-generous or disproportionate to the relief allocated to the Class.  Plaintiffs

3    represent that their attorneys will seek an award of attorneys' fees and costs of no more

4    than $290,000, to be paid directly by Defendants rather than from a gross settlement

5    fund.  (Am. Agreement ¶ 5.7.1.)  This is one of the lower proposed fee awards this court

6    has encountered in a class action settlement.  *See, e.g.*, *McClintic v. Lithia Motors, Inc.*,

7    No. C11-859RAJ, 2011 WL 13127844, at *6 (W.D. Wash. Oct. 19, 2011) (observing that

8    a $600,000 maximum attorneys' fee award was "among the lowest" that court had seen).

9    It is difficult to value the total relief offered by this claims-based settlement because it is

10   currently unknown how many Class members will file claims and which forms of relief

11   they will choose among the forms of relief offered.  The court observes, however, that the

12   parties have not placed any upper limits on the amount Defendants will pay to Class

13   members.  (*See generally* Am. Agreement; *see also* 1/15/23 Turner Decl. ¶ 3 (estimating

14   Defendants' maximum exposure as in excess of $1.67 million if all Class members

15   choose 5% refunds; $3.34 million if all Class members choose 10% coupons; or $33

16   million if all Class members choose a full refund).)  At this preliminary stage, the court

17   concludes that the proposed fee request is reasonable and does not support a finding that

18   the settlement is the product of a reverse auction.

19       To be sure, Intervenors' counsel and Defendants' counsel present very different

20   narratives regarding their communications about the possibility of mediation and

21   settlement.  (*See* Resp. at 3-6; Defs. Reply at 5-7.)  Intervenors assert that Defendants'

22   counsel misled them into believing that Defendants might agree to mediation and

1    solicited a settlement proposal from them.  (Resp. at 1, 5; 3/22/23 Joint Decl. (Dkt. # 38)

2    ¶¶ 12-49.)  Defendants' counsel, meanwhile, denies these accusations and insists that his

3    clients never entertained the thought of mediation and that he neither engaged in any

4    substantive negotiations with nor solicited any bids from Intervenors' counsel.[2]  (Defs.

5    Reply at 5-7; 3/31/23 Madonia Decl. ¶¶ 10-11 (stating that Defendants' counsel was

6    "keeping [Intervenors' counsel] at a distance while attempting to finalize the settlement

7    greatly underway with [Plaintiffs]"); *id.* ¶ 18 (stating Defendants never agreed to

8    mediate); 3/31/23 Davis Decl. ¶ 14 (stating Defendants "had no interest in incurring the

9    costs of engaging an outside mediator" after having achieved a settlement with

10   Plaintiffs).)  Although Intervenors' counsel and Defendants' counsel tell very different

11   stories about their discussions, the court is satisfied, for the purpose of preliminary

12   approval, that the undisputed facts demonstrate that proposed settlement is not the

13   product of a reverse auction or otherwise the result of collusion.  The court also

14   preliminarily finds that the settlement is the result of arm's length negotiations based on

15   the declarations of counsel for Plaintiffs and Defendants, which indicate that the

16   settlement was reached after informal discovery and several months of negotiation.  (*See*

17   *generally* 2/13/23 Turner Decl.; 3/31/23 Madonia Decl.)

18        In addition, the court preliminarily finds that the named Plaintiffs have adequately

19   represented the Class by providing information to their attorneys about the relevant

20

21        [2] Although "the best practice of class action settlement negotiation is to undertake such
     talks . . . with the assistance of a neutral third party," 4 Newberg and Rubenstein on Class
22   Actions § 13:2 (6th ed.), the Federal Rules do not require the parties to engage in mediation to
     show that the settlement was non-collusive.

recordings, the technical aspects of the recording market, and the primary and secondary markets for the Applicable Records.  (1/15/23 Turner Decl. ¶ 6.)  The court also preliminarily concludes that the $10,000 service awards that Plaintiffs will request do not undermine their adequacy as representatives because the settlement is not contingent on the court awarding the requested awards and the awards are not tied to the ultimate class recovery.  *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009) (finding a conflict of interest between the named plaintiffs and the class where incentive awards were tied to the ultimate recovery in the case).  There is nothing else in the record that suggests that the named Plaintiffs have not vigorously pursued relief on behalf of the class.  *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985-86 (9th Cir. 2011) (finding named plaintiff was an adequate representative where she shared interests with the class members and nothing suggested she would not vigorously pursue relief).

Accordingly, the Rule 23(e)(2)(A) and (B) factors weigh in favor of preliminary approval of the settlement.

2.      Adequacy of Class Relief

Rule 23(e)(2)(C) requires the court to evaluate "whether the relief provided for the class is adequate, taking into account:  (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; [and] (iii) the terms of any proposed award of attorney's fees, including timing of payment."  Fed. R. Civ. P. 23(e)(2)(C).[3]

---

[3] Rule 23(e)(2)(C)(iv)—requiring the court to take into account any "agreement required to be identified under Rule 23(e)(3)"—is not at issue here.

1   Here, Intervenors contend that the relief the proposed settlement provides to the Class is

2   inadequate for four reasons:  (1) Plaintiffs' counsel have misrepresented the scope of the

3   proposed settlement class; (2) the full refund component of the proposed settlement is

4   "illusory" because it will have little value to most Class members and the claims process

5   is unduly cumbersome; (3) the refund and coupon components of the proposed settlement

6   are inadequate, particularly when compared to Intervenors' estimate of Defendants'

7   liability; and (4) the risks of continuing with the lawsuit do not warrant a "significant

8   discounting" of Plaintiffs' claims.  (Resp. at 7-19.)  The court addresses each of

9   Intervenors' arguments in turn.[4]

10                    *a.*     *Scope of the Settlement Class*

11        Intervenors contend that Plaintiffs have been dishonest to the court about the

12   limited scope of the Class.  (*Id.* at 7-8.)  They argue the Plaintiffs have (1) represented to

13   the court that the Class is much larger than it is; (3) intentionally "circumscribed" the

14   Class; and (3) provided for the full refund process to take place only after final approval

15   in an effort to limit the amount paid out to the Class.  (*Id.*)

16        The court is not persuaded by these arguments.  First, Plaintiffs have not deceived

17   the court as to the scope of the Class; to the contrary, the court has always understood

18   that the Class is limited to original retail purchasers who still own their Applicable

19   Records.  (*See* Am. Agreement ¶ 4.28.)  Indeed, individuals who purchased their

20

21            ————————————

             [4] The court preliminarily concluded that Plaintiffs' request for attorneys' fees was

22   reasonable above, in its discussion of the adequacy of representation.  (*See supra* Section
   III.B.1.)

1    Applicable Records from other sources are expressly excluded from the Class definition.

2    (*Id.*)  Second, the court agrees with Plaintiffs that the limits placed on the Class make

3    sense for commonality because Defendants either know or can ascertain the retail price of

4    the recordings, the condition of the recordings, and the universe of retailers when the

5    class is limited to original purchasers.  (*See* Pls. Reply at 7-8.)  Finally, as Plaintiffs point

6    out, Intervenors' complaint that the settlement provides for payment of full refunds only

7    after final approval defies common sense.  (*See* Resp. at 8; Pls. Reply at 8.)  Requiring

8    Class members to mail their Applicable Records to Defendant before the final approval

9    hearing would result in unnecessary expense and delay to return the recordings if the

10   court ultimately does not approve the settlement.  The court is satisfied, for the purpose

11   of preliminary approval, that the scope of the proposed settlement Class is reasonable.

12                       *b.     Full Refund Component*

13          Intervenors complain that the full refund component of the proposed settlement is

14   "illusory" for three reasons:  (1) it is unlikely that Class members will file claims for full

15   refunds because the Applicable Records are not defective—they were "simply

16   overpriced"; (2) the claims process is overly cumbersome, making it difficult for Class

17   members to qualify for the full refund; and (3) the settlement excludes Class members

18   who no longer possess their Applicable Records.  (Resp. at 8-10.)  Again, the court is not

19   persuaded.

20          First, Intervenors argue that there is "no evidence" that the full refund component

21   of the settlement will have any value to the Class members because it is unlikely that

22   consumers would return "overpriced but otherwise functional" records.  (Resp. at 8-9

1  (citing *Briseno v. Henderson*, 998 F.3d 1014, 1028 (9th Cir. 2021)).)  Plaintiffs

2  acknowledge, however, that it is likely that many Class members will choose to keep

3  their records, particularly where the value of the records is higher on the secondary

4  market than the original purchase price.  (Pls. Reply at 9.)  They explain that the

5  settlement includes the partial refund and coupon options in order to compensate these

6  Class members.  (Pls. Reply at 9; Mot. at 3.)  Defendants, meanwhile, point out that

7  Intervenors' own settlement proposal included a full refund component that required

8  class members to return their records to receive the refund.  (Defs. Resp. at 9 (citing

9  3/31/23 Madonia Decl., Ex. 3 at 2).)

10      Second, Intervenors contend that the requirements to receive a full refund are

11  overly cumbersome because they require the Class member to return the record with all

12  of its original packaging, including shipping materials, in "complete and undamaged

13  condition except for normal wear and tear."  (Resp. at 9.)  Defendants explain, however,

14  that the Amended Settlement Agreement requires only that the records be returned "in

15  their original covers and/or boxes," meaning the original record jacket or box set

16  packaging, and does not require the original shipping materials.  (Defs. Reply at 9-10

17  (first citing Am. Agreement ¶ 5.1; and then citing 3/31/23 Davis Decl. ¶ 6).)  With

18  respect to "normal wear and tear," Plaintiffs explain that the Amended Settlement

19  Agreement instructs the Settlement Administrator to evaluate claims "under liberal terms

20  to effect the settlement" and that older recordings are expected to have more "normal

21  wear and tear" than newer recordings.  (*Id.* at 9-10; *see* Am. Agreement ¶¶ 4.23(e)

22  (requiring proof of purchase to be evaluated under liberal terms), 4.24(c) (requiring proof

ORDER - 17

1    of ownership to be evaluated under liberal terms); *see also* 3/31/23 Davis Decl. ¶ 6

2    (explaining that "normal wear and tear" will be liberally construed because "records [are]

3    meant to be played, listened to, and enjoyed").)

4         Finally, as the court noted above, the settlement does not improperly bar Class

5    members who no longer possess their Applicable Records from relief because individuals

6    who no longer own the records individuals are expressly excluded from the Class

7    definition. (*See supra* Section III.B.2.a; Am. Agreement ¶ 4.28.) Based on the

8    foregoing, the court agrees with Plaintiffs and Defendants that although it may be

9    unlikely that many Class members will choose a full refund, it is not an illusory benefit.

10                    c.    *Cash and Coupon Components*

11        Intervenors also contend that the cash and coupon components of the proposed

12   settlement provide inadequate relief because they do not compare favorably to

13   Intervenors' estimate of Defendants' potential liability at trial. (Resp. at 10-16.)

14   Intervenors' estimate, however, does not withstand scrutiny. Intervenors begin by

15   assuming that the entire price difference between Defendants' base-level "Silver Label"

16   recordings (which they estimate retail for an average price of $30.00) and the OMR and

17   One-Step recordings is based solely on Defendants' misrepresentation that the OMR and

18   One-Step recordings were produced using analog-only mastering processes. (3/23/23

19   Joint Decl. ¶¶ 53-54.) As a result, according to Intervenors, Defendants charged the

20   Class members a "price premium" of $12.16 for OMR recordings (which Intervenors

21   estimate retailed for an average price of $42.16) and a staggering $90.59 for One-Step

22   recordings (which Intervenors estimate retailed for an average price of $120.59). (*Id.*)

1   Based on these purported price premiums, Intervenors assert that Defendants' potential

2   liability at trial is $16.65 million, excluding statutory and treble damages.  (*Id.* ¶ 56.)

3       Intervenors' estimate, however, ignores that the mastering process used is just one

4   of many differences between the Silver Label recordings and the higher-priced OMR and

5   One-Step recordings.  For example, OMR recordings are made of heavier and costlier

6   vinyl than the Silver Label recordings and are "produced using a more expensive

7   manufacturing process, a more expensive and higher grade of packaging, a higher level

8   of quality control, and a more exacting and time-consuming mastering process."  (3/31/23

9   Davis Decl. ¶ 8(a).)  One-Step recordings, meanwhile, are double-album box sets made

10  from even higher-grade vinyl than the OMR recordings and are produced using a "more

11  time-consuming and vastly more expensive 'One-Step' plating and cutting process" than

12  the OMR and Silver Label recordings.  (*Id.* ¶¶ 8(b), (c).)  In addition, each One-Step box

13  set "includes additional, premium packaging, including the cover box itself, gold-foil

14  stamping, inner liners and protective foam inserts, and other inserts and/or photos not

15  otherwise available" in Defendants' other recordings.  (*Id.* ¶ 8(d).)  In light of these

16  distinctions, it is nonsensical to attribute the entire difference in price between the Silver

17  Label recordings and the OMR and One-Step recordings on Defendants' alleged

18  misrepresentation that the OMR and One-Step recordings were produced without a

19  digital processing step.

20      Because Intervenors' argument that the parties' proposed settlement provides

21  inadequate relief relies almost entirely on their comparison of the settlement to their inapt

22  valuation of the case (*see* Resp. at 10-16), the court rejects their attack on the adequacy of

1    relief.  The court preliminarily concludes that the cash and coupon components of the

2    settlement provide adequate relief to the Class.

3                    d.        *Risks of Trial and Appeal*

4            Finally, Intervenors argue that Plaintiffs have not established that the risks of trial

5    and appeal do not warrant the "significant discounting" of their claims represented by the

6    settlement agreement.  (Resp. at 16-19.)  Again, the court disagrees with Intervenors.

7    Plaintiffs assert that their primary risk was not in establishing liability, but rather in

8    proving damages because the value of the Applicable Records has increased over time.

9    (Reply at 12 (citing 1/15/23 Turner Decl. ¶ 4).)  Plaintiffs assert that Defendants' OMR

10   and One-Step recordings "are valued not only for their enhancement of the listening

11   experience over traditional vinyl products and digital recordings, but also for their

12   likelihood for enhanced value over time as a collectible item."  (1/15/23 Turner Decl.

13   ¶ 4.)  As a result, many of these recordings have a greater value on the secondary market

14   than their original purchase price.  (*Id.*; *see also* 3/31/23 Davis Decl. ¶ 7 (noting that

15   many of Defendants' records sell on secondary platforms such as Discogs and eBay for

16   "much more than their purchase price").)  Indeed, at least some of the Applicable

17   Records appear to have increased in value since July 2022, when Defendants' president

18   acknowledged the use of a digital processing step in producing the Applicable Records.

19   (*see* 3/31/23 Turner Decl. ¶ 3 (listing resale offers on Discogs for a subset of Applicable

20   Records as of March 31, 2023)), and Defendants' president asserts that sales of the

21   Applicable Records have *increased* since the five class action lawsuits were filed (*see*

22   3/31/23 Davis Decl. ¶ 4).  Therefore, the court agrees with Plaintiffs that they faced

substantial risks in proving that Class members were damaged by Defendants' alleged

representations that its OMR and One-Step recordings were produced using an all-analog

mastering process.

### 3.   Whether the Settlement Treats Class Members Equitably

Rule 23(e)(2)(D) requires the court to evaluate whether the settlement proposal

"treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D).  The

court concludes that it does.  The Amended Settlement Agreement provides all Class

members the same three forms of relief.  (*See* Am. Agreement ¶ 5.1.)  Aside from the

request for service awards for the named Plaintiffs, the Amended Settlement Agreement

does not include any provisions that would result in inequitable treatment of any Class

members.  (*See generally id.*); *see Rodriguez*, 563 F.3d at 958-59 (noting that incentive

awards are "fairly typical" in class actions and are "intended to compensate class

representatives for work done on behalf of the class").  Accordingly, the court concludes

for the purpose of preliminary approval that the Amended Settlement Agreement treats

the Class members equitably relative to one another.

In sum, the court concludes that Plaintiffs have demonstrated that the court "will

likely be able to . . . approve the proposal under Rule 23(e)(2)."  Fed. R. Civ. P.

23(e)(1)(B)(i).

## C.   Class Certification Requirements

Having addressed the Rule 23(e)(2) factors, the court now evaluates whether the

parties have shown that the court will likely be able to certify the Class for settlement

purposes under Rule 23(a) and Rule 23(b)(3).  Fed. R. Civ. P. 23(c)(1)(B)(ii).

1          1.      Rule 23(a) Factors

2          Rule 23(a) establishes four prerequisites for class action litigation, which are:

3   (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  Fed.

4   R. Civ. P. 23(a).  The court preliminarily concludes that these factors have been met.

5          First, numerosity is satisfied if "the class is so large that joinder of all members is

6   impracticable."  Fed. R. Civ. P. 23(a)(1).  Here, where the Class may include as many as

7   40,000 direct and indirect purchasers of the Applicable Records (*see* 1/15/23 Davis Decl.

8   ¶ 4), the court concludes that the numerosity requirement is met for settlement purposes.

9          Second, commonality requires the court to consider whether "there are questions

10  of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The claims of the

11  proposed class must "depend upon a common contention . . . of such a nature that it is

12  capable of classwide resolution."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350

13  (2011).  The court preliminarily concludes that the commonality requirement is satisfied

14  because all Class members experienced the same alleged injury based on their reliance on

15  Defendants' alleged misrepresentation that they used an all-analog mastering chain to

16  produce the Applicable Records.  (*See generally* Am. Compl.)

17         Third, typicality requires the court to consider whether "the claims or defenses of

18  the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ.

19  P. 23(a)(3).  This factor closely resembles the commonality factor and requires that the

20  representatives be "part of the class and 'possess the same interest and suffer the same

21  injury' as the class members."  *General Tel. Co. of the Southwest v. Falcon*, 457 U.S.

22  147, 156-57 (1982).  Here, Plaintiffs were direct customers of Defendants who purchased

Applicable Records in reliance on Defendants' representations about the mastering process for those records.  (Am. Compl. ¶¶ 31-32.)  As with commonality, the court preliminarily finds that typicality is satisfied because Plaintiffs' claims arose from the same alleged misrepresentations by Defendants that affected all of the members of the Class.  (*See generally id.*)

Finally, adequacy requires the court to determine whether "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To do so, "courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'"  *Ellis*, 657 F.3d at 985 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564 U.S. at 350).  The court addressed these questions above in its evaluation of Rule 23(e)(2)(A)'s adequacy of representation requirement.  (*See supra* Section III.B.1.)  Thus, the court also concludes, for the purpose of preliminary approval, that Rule 23(a)(4)'s adequacy requirement has been satisfied.

Having concluded that Plaintiffs have shown that it is likely that the court will be able to certify the class for settlement purposes under Rule 23(a), the court proceeds to evaluate whether they have also shown that certification is likely under Rule 23(b).

2.     Rule 23(b)(3)

Plaintiffs seek certification of the settlement Class under Rule 23(b)(3), which requires the court to find "that the questions of law or fact common to class members

1    predominate over any questions affecting only individual members, and that a class

2    action is superior to other available methods for fairly and efficiently adjudicating the

3    controversy." Fed. R. Civ. P. 23(b)(3); (*see* Mot. at 23-24). The court concludes that

4    these requirements have been met for the purpose of conditional certification. First,

5    common issues predominate because all of the Class members are alleged to have

6    suffered the same injury based on the same alleged misrepresentations by Defendants.

7    (*See generally* Am. Compl.) Second, because the Class may consist of approximately

8    40,000 members, class resolution is superior to adjudicating numerous individual

9    lawsuits regarding Defendants' alleged misrepresentations.

10          In sum, the court concludes that the parties have shown that the court is likely to

11   find that the settlement is "fair, reasonable, and adequate" under Rule 23(e)(2) and to

12   certify the Class for settlement purposes under Rules 23(a) and 23(b)(3). Fed. R. Civ. P.

13   23(c)(1)(B). Therefore, the court GRANTS Plaintiffs' motion for preliminary approval

14   of the parties' class action settlement.

15                          **IV.    CONCLUSION**

16          For the foregoing reasons, the court GRANTS Plaintiffs' motion for preliminary

17   approval of the parties' class action settlement (Dkt. # 26). Accordingly, the court

18   ORDERS as follows:

19          1.    The court has jurisdiction over the subject matter of this action and personal

20   jurisdiction over the parties and the Class.

21          2.    The court finds that the Amended Settlement Agreement (2/2/23 Turner

22   Decl. ¶ 2, Ex. 1) resulted from arm's-length negotiations and is sufficient to warrant

1   notice thereof to members of the Class and scheduling of the final approval hearing.

2   3.   The court preliminarily finds, for the reasons set forth above, that the

3   Amended Settlement Agreement is fair, adequate, and reasonable pursuant to Federal

4   Rule of Civil Procedure 23(e)(2).

5   4.   The court preliminarily finds, for the reasons set forth above, that the

6   requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3) are likely to be

7   satisfied and therefore conditionally certifies the following Class:

8   All original retail consumers in the United States who, from March 19, 2007,
    through July 27, 2022 purchased, either directly from a Defendant or other
9   retail merchants, new and unused Mobile Fidelity Sound Lab, Inc. ("MoFi")
    vinyl recordings which were marketed by Defendants using the series
10   labeling descriptors "Original Master Recording" and/or "Ultradisc
    One-Step," that were sourced from original analog master tapes and which
11   utilized a direct stream digital transfer step in the mastering chain, and
    provided that said purchasers still own said recordings (the "Applicable
12   Records").   Excluded from the Class are persons who obtained subject
    Applicable Records from other sources.

13
14   5.   The court appoints Kroll Settlement Administration LLC ("Kroll") as the

15   Settlement Administrator.  Kroll shall fulfill the functions, duties, and responsibilities of

    the Settlement Administrator as set forth in the Amended Settlement Agreement and this
16
    Order.
17
18   6.   The court appoints Plaintiffs Stephen J. Tuttle and Dustin Collman as Class

19   representatives for settlement purposes only.

20   7.   The court appoints Duncan Calvert Turner of Badgley Mullins Turner

    PLLC as Class counsel for settlement purposes only.
21
22

ORDER - 25

1      8.     The court approves the proposed forms of notice attached as Exhibits C and

2    D to the Amended Settlement Agreement and the plan for giving notice to the Class as set

3    forth in the Amended Settlement Agreement and the declaration of Jeanne C. Finegan

4    (Dkt. # 27) ("Notice Plan").  The Notice Plan, in form, method, and content, fully

5    complies with the requirements of Federal Rule of Civil Procedure 23(c)(2)(B) and due

6    process, constitutes the best notice practicable under the circumstances, and is due and

7    sufficient notice to all persons entitled thereto.  The court finds that the Notice Plan is

8    reasonably calculated to, under all circumstances, reasonably apprise the Class members

9    of the pendency of this action, the terms of the Amended Settlement Agreement, the right

10    to object to the settlement, and how to exclude themselves from the Class.

11      9.     Pursuant to Federal Rule of Civil Procedure 23(e)(2), a hearing will be held

12    before this court to determine whether the Amended Settlement Agreement should be

13    given final approval by the court; to consider the application for attorneys' fees and

14    expenses of Class counsel; to consider the application for service awards to Plaintiffs;

15    and to rule on any other matters that the court may deem appropriate.

16      10.    The final approval hearing is scheduled for **Monday, October 30, 2023, at**

17    **9:00 a.m.** before the Honorable James L. Robart at the United States District Court for

18    the Western District of Washington, 700 Stewart Street, Suite 14106, Seattle, WA 98101.

19    The court may change the date for the final approval hearing.  If the court changes the

20    hearing date, notice of such change shall be posted on the settlement website.

21      11.    This matter is STAYED until further order of this court, except for such

22    proceedings that may be necessary to implement the settlement and this order.

1    12.    The following deadlines shall govern proceedings through the final

2  approval hearing:

| Event | Days after Preliminary Approval | Date |
|---|---|---|
| Preliminary Approval Order | 0 | May 9, 2023 |
| Notice Deadline | 45 | June 23, 2023 |
| Plaintiffs' Counsel's Fee Motion Deadline | 70[5] | July 18, 2023 |
| Exclusion/Objection Deadline | 105 | August 22, 2023 |
| Claims Administrator's Filing of Exclusion Requests | 112 | August 29, 2023 |
| Class Member Claim Form Submission Deadline | 135 | September 21, 2023 |
| Parties' Final Approval Motion Deadline | 150[6] | October 6, 2023 |
| Responses to Objections Deadline | 150 | October 6, 2023 |
| **Final Approval Hearing** | | **October 30, 2023** |

Dated this 9th day of May, 2023.

JAMES L. ROBART
United States District Judge

---

[5] The court changed the parties' proposed deadline for Plaintiffs' counsel to file their motion for attorneys' fees pursuant to Federal Rule of Civil Procedure 23(h), which provides that class members must have an opportunity to object to a motion for fees.  Fed. R. Civ. P 23(h)(2); *see In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 995 ("[A] schedule that requires objections to be filed before the fee motion itself is filed denies the class the full and fair opportunity to examine and oppose the motion that Rule 23(h) contemplates.").

[6] The court added 15 days to the parties' proposed deadline for the their final approval motion so that the parties can include the number of claims filed, the types of relief sought, and the total value of the settlement in their materials.  (*See* Mot. at 25.)

ORDER - 27