1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

STEPHEN J. TUTTLE, et al.,                    CASE NO. C22-1081JLR

11                          Plaintiffs,        ORDER

12          v.

13   AUDIOPHILE MUSIC DIRECT,
     INC., et al.,

14
                            Defendants.

15

16                          I.      INTRODUCTION

17          Before the court are Plaintiffs Stephen J. Tuttle and Dustin Collman's

18   (collectively, "Plaintiffs") motions for (1) final approval of their proposed class action

19   settlement with Defendants Audiophile Music Direct, Inc. ("Music Direct") and Mobile

20   Fidelity Sound Lab Inc. ("MoFi") (together, "Defendants) (Approval Mot. (Dkt. # 56))

21   and (2) approval of attorneys' fees, costs, and class representative service awards (Fees

22   Mot. (Dkt. # 49)).   The court received seven objections to the proposed settlement.

1   (Objs. (Dkt. ## 44- 47, 52-54).)  Class counsel filed a response to the objections, and

2   Defendants filed a brief in support of Plaintiffs' motion for final approval.  (Objs. Resp.

3   (Dkt. # 58); Approval Resp. (Dkt. # 60).)

4       The court held a final approval hearing on October 30, 2023, during which counsel

5   for Plaintiffs and Defendants presented argument in support of the parties' settlement.

6   (*See* 10/30/2023 Min. Entry (Dkt. # 64); 10/30/23 Hr'g Tr. (Dkt. # 67).)  None of the

7   Objectors appeared at the hearing.  (*See* 10/30/2023 Min. Entry.)  On November 13,

8   2023, Plaintiffs filed supplemental information in response to questions the court asked at

9   the hearing.  (11/13/23 Supp. (Dkt. # 70); *see* 10/30/23 Min. Order (Dkt. # 65) at 2

10  (listing the court's questions).)  The court has reviewed all of the foregoing, the relevant

11  portions of the record, and the governing law.  Being fully advised, the court GRANTS

12  Plaintiffs' motions for final approval of the class action settlement and for attorneys' fees,

13  costs, and class representative service awards.

14  ## II.      BACKGROUND

15      Below, the court sets forth the factual and procedural background relevant to

16  Plaintiffs' motions.

17  **A.   Factual Background**

18      Defendants are producers and sellers of vinyl music records.  (Am. Compl. (Dkt.

19  # 14) ¶ 1.)  One of Defendants' product lines, according to Plaintiffs, "consists of analog

20  recordings that are made without the use of digital processing, i.e., by duplicating the

21  original analog master recordings using only analog processes."  (*Id.*)  Plaintiffs assert

22  that recordings made without a digital processing step, known as "triple-analog"

1  recordings, are "highly valued by high-end audiophiles and collectors" and as a result,

2  Defendants were able to charge a "high premium" for recordings that they claimed were

3  produced without a digital processing step.  (*Id.* ¶¶ 1, 22-24.)

4        At issue in this case are 124 of Defendants' "Original Master Recording"

5  ("OMR") and "Ultradisc One-Step" ("One-Step") recordings, which, according to

6  Plaintiffs, Defendants represented as being triple-analog offerings when they in fact were

7  produced using a digital processing step (the "Applicable Records").  (*Id.* ¶¶ 2-3; *see also*

8  *id.* ¶ 27 (quoting a July 27, 2022 statement in which Defendants' president, James Davis,

9  acknowledged that Defendants had used digital technology in their mastering chain);

10  3/31/23 Davis Decl. (Dkt. # 41-1) ¶ 2 (stating that Defendants' investigation identified

11  124 Applicable Records); 2/2/23 Turner Decl. (Dkt. # 28) ¶ 2, Ex. 1 ("Agreement"), Ex.

12  A (listing the Applicable Records).)  Defendants also offer base-level "Silver Label"

13  recordings that retail for $29.99.  (3/31/23 Davis Decl. ¶ 8(a).)  OMR recordings, which

14  sell for $39.99, are made of heavier and costlier vinyl than the Silver Label recordings

15  and are "produced using a more expensive manufacturing process, a more expensive and

16  higher grade of packaging, a higher level of quality control, and a more exacting and

17  time-consuming mastering process."  (*Id.*)  One-Step recordings, which retail for

18  approximately $120.00, are double-album box sets made from even higher-grade vinyl

19  than the OMR recordings and are produced using a "more time-consuming and vastly

20  more expensive 'One-Step' plating and cutting process" than the OMR and Silver Label

21  recordings.  (*Id.* ¶¶ 8(b)-(c).)  In addition, each One-Step box set "includes additional,

22  premium packaging, including the cover box itself, gold-foil stamping, inner liners and

1  protective foam inserts, and other inserts and/or photos not otherwise available" in

2  Defendants' other recordings.  (*Id.* ¶ 8(d).)  Plaintiffs assert, on behalf of themselves and

3  proposed Washington and nationwide classes, that they reasonably relied on Defendants'

4  representations that the Applicable Records were produced using analog-only processes;

5  purchased the recordings either directly from Defendants or from third-party retailers in

6  reliance on those representations; and suffered damage as a result.  (Am. Compl. ¶¶ 2, 30,

7  35 (proposed Washington class definition), 36 (proposed national class definition).)

8     Defendants' sales records indicate that they sold over 634,000 Applicable Records

9  between 2007 and July 27, 2022.  (1/15/23 Turner Decl. (Dkt. # 18) ¶ 2.)  Defendants

10  sold approximately 25% of the Applicable Records directly to retail customers ("direct

11  purchasers"), and the remaining 75% through other retailers such as Target and Walmart

12  ("indirect purchasers").  (*Id.*)  Plaintiffs' research indicates that "most, if not all" of the

13  Applicable Records that have been cared for properly have a value on the secondary

14  market that exceeds their original purchase price.  (*Id.* ¶ 4; 3/31/23 Turner Decl. (Dkt.

15  # 40) ¶ 3 (listing the resale value for a sampling of Applicable Records).)

16  **B.    Procedural Background**

17     Plaintiffs filed this action on August 2, 2022, and amended their complaint on

18  December 20, 2022.  (Compl. (Dkt. # 1); Am. Compl.)  They raised a claim for violation

19  of the Washington Consumer Protection Act, ch. 19.86 RCW, on behalf of the

20  Washington class and claims for breach of contract, unjust enrichment, and violation of

21  the Illinois Consumer Fraud Act, 815 Ill. Comp. Stat. 505/2, on behalf of the nationwide

22  class.  (Am. Compl. ¶¶ 35-36, 46-69.)

1      Between August 18 and September 23, 2022, other sets of plaintiffs filed separate

2  proposed class actions against Defendants in the Northern District of Illinois, the Central

3  District of California, and the Northern District of California.  *See Stiles v. Mobile*

4  *Fidelity Sound Lab, Inc.*, No. 1:22-cv-04405 (N.D. Ill.) (filed August 18, 2022);

5  *Bitterman v. Mobile Fidelity Sound Lab, Inc.*, No. 1:22-cv-04714 (N.D. Ill.) (filed

6  September 1, 2022); *Allen v. Audiophile Music Direct*, No. 2:22-cv-08146-GW-MRW

7  (C.D. Cal.) (filed September 22, 2022, in Los Angeles County Superior Court before

8  being removed to federal court); *Molinari v. Audiophile Music Direct*, No.

9  4:22-cv-05444-CRB (N.D. Cal.) (filed September 23, 2022).  Thus, this case is the

10  first-filed action challenging Defendants' alleged misrepresentation of their OMR and

11  One-Step recordings as triple-analog.

12      Plaintiffs originally moved for preliminary approval of the parties' class action

13  settlement on January 15, 2023.  (1/15/23 Mot. (Dkt. # 17).)  On January 20, 2023, the

14  court denied the motion without prejudice; directed Plaintiffs to correct several issues the

15  court had identified in Plaintiffs' preliminary approval materials; and granted Plaintiffs

16  leave to submit revised materials with a renewed motion for preliminary approval.  (*See*

17  *generally* 1/20/23 Order (Dkt. # 21).)

18      On January 27, 2023, Adam Stiles, Omar Flores, and Gregory Bitterman

19  (collectively, "Intervenors"), the named plaintiffs in the *Stiles* and *Bitterman* matters in

20  the Northern District of Illinois, filed a motion to intervene in this case.  (MTI (Dkt.

21  # 23).)  Plaintiffs filed their revised motion for preliminary approval and amended

22  settlement agreement (the "Agreement") on February 2, 2023.  (2/2/23 Mot. (Dkt. # 26);

1    Agreement.)  On March 13, 2023, the court granted Intervenors' motion to intervene for

2    the limited purpose of opposing Plaintiffs' revised motion.  (3/13/23 Order (Dkt. # 36) at

3    2.[1])

4            The court granted Plaintiffs' revised motion for preliminary approval on May 9,

5    2023.  (5/9/23 Order (Dkt. # 42).)  In relevant part, the court rejected Intervenors'

6    arguments that the court should deny preliminary approval because the settlement was the

7    result of a "collusive reverse auction"[2] and the relief provided for the class was

8    inadequate.  (*See generally id.*; Intervenors' Resp. (Dkt. # 37).)  First, the court

9    determined that the proposed settlement was not the result of a reverse auction because it

10   lacked "the hallmarks of a reverse auction recognized in the case law:  ineffectual

11   lawyers, evidence that the defendant negotiated with those lawyers *because of* their

12   supposed ineffectiveness, and overly generous attorneys' fees compared to the relief

13   offered to the class."  (5/9/23 Order at 10-13.)  Second, the court determined, for the

14   purpose of preliminary approval, that (1) the relief offered to the class was adequate,

15   (2) the scope of the proposed settlement class was reasonable, (3) the Full Refund

16   component of the settlement was not illusory; (4) Intervenors' estimate of Defendants'

17

18

19        [1] None of the Intervenors filed objections to the settlement.  (*See generally* Dkt.)

20        [2] "A reverse auction is said to occur when 'the defendant in a series of class actions picks
21   the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court
     will approve a weak settlement that will preclude other claims against the defendant.'"  *Negrete*
     *v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1099 (9th Cir. 2008) (quoting *Reynolds v.*
22   *Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002)).

1    potential liability did not withstand scrutiny; and (5) the risks of trial and appeal justified

2    the proposed settlement.  (*Id.* at 14-21.)

3        Ultimately, the court concluded that preliminary approval was appropriate under

4    Federal Rule of Civil Procedure 23(e)(1)(B), which requires the settling parties to show

5    that the court "will likely be able to:  (i) approve the proposal under Rule 23(e)(2); and

6    (ii) certify the class for purposes of judgment on the proposal."  Fed. R. Civ. P.

7    23(e)(1)(B); (*see generally* 5/9/23 Order).  The court appointed Kroll Settlement

8    Administration, LLC ("Kroll") as Settlement Administrator; Plaintiffs as class

9    representatives for the purpose of settlement; and Plaintiffs' attorney, Duncan Calvert

10   Turner of Badgley Mullins Turner PLLC, as class counsel for the purpose of settlement.

11   (*Id.* at 25.)  The court also conditionally certified the proposed settlement class and

12   approved Plaintiffs' proposed notice plan.  (*Id.* at 25-26.)

13   **C.    Settlement Terms**

14       The proposed settlement class (the "Class") is comprised of:

15       All original retail consumers in the United States who, from March 19, 2007,
16       through July 27, 2022 purchased, either directly from a Defendant or other
         retail merchants, new and unused Mobile Fidelity Sound Lab, Inc. ("MoFi")
17       vinyl recordings which were marketed by Defendants using the series
         labeling descriptors "Original Master Recording" and/or "Ultradisc
18       One-Step," that were sourced from original analog master tapes and which
         utilized a direct stream digital transfer step in the mastering chain, and
19       provided that said purchasers still own said recordings (the "Applicable
         Records").  Excluded from the Class are persons who obtained subject
20       Applicable Records from other sources.

21   (Agreement ¶ 4.28.)  Thus, individuals who (1) no longer own the Applicable Records

22   they purchased, (2) purchased their Applicable Records on the secondary market, or

ORDER - 7

1  (3) received their Applicable Records from third parties (for example, as gifts) are

2  expressly excluded from the Class.  (*See id.*)

3       The proposed settlement offers class members their choice of three forms of relief.

4  Class members may choose to return their Applicable Records and receive a full refund

5  of the price they paid for those records, plus tax and shipping costs ("Full Refund").  (*Id.*

6  ¶ 5.1(a).)  Class members who wish to keep their Applicable Records, meanwhile, may

7  choose either:  (1) a refund of five percent of the price they paid for their Applicable

8  Records, plus tax and shipping ("5% Refund"), or (2) a coupon for ten percent of the

9  price they paid for their Applicable Records, plus tax and shipping, that can be redeemed

10  for the purchase of any product offered on Defendants' Music Direct website ("10%

11  Coupon").  (*Id.* ¶¶ 5.1(b)-(c).)  Coupons expire 180 days after issuance and are not

12  transferable.  (*Id.* ¶ 5.1(c).)  A class member may combine the value of multiple coupons

13  when making a purchase on Defendants' website.  (*Id.*)

14       Class members who purchased multiple Applicable Records may select among the

15  three forms of relief for each record—for example, a class member may choose to receive

16  a full refund for one record and a coupon for another.  (*Id.* ¶ 5.1(d).)  Class members must

17  show both proof of purchase and proof of ownership of their Applicable Records to

18  receive a refund or coupon.  (*Id.* ¶¶ 4.23, 4.24, 5.1.)  Class members who purchased their

19  records directly from Defendants' websites (that is, "direct purchaser" class members)

20  face a relaxed requirement for showing proof of purchase.  (*Id.* ¶ 4.23(d) (stating that

21  these class members need only provide their name plus certain additional information,

22  rather than a receipt).)

1     Class members who do not opt out of the settlement agree to release Defendants

2  from any claims, known or unknown, which "arise out of or are in any way related to

3  Defendants' marketing, promotion, and sale of the Applicable Records" between March

4  19, 2007, and July 17, 2022, or which could have been raised in this litigation related to

5  the Applicable Records.  (*Id.* ¶¶ 4.1, 4.26, 4.33, 5.6.)

6     The Agreement also provides that Plaintiffs will request an award of attorneys'

7  fees and costs of $290,000 and ask the court to approve a service award of $10,000 for

8  each of the named Plaintiffs.  (*Id.* ¶¶ 5.7.1, 5.7.2.)  Attorneys' fees, costs, and service

9  awards will be paid directly by Defendants, and Defendants will bear all expenses and

10  costs arising from the administration of the settlement.  (*Id.* ¶¶ 5.3.8, 5.7.1, 5.7.2, 5.8.)

11  **D.   Class Response**

12     Defendants estimate that the Class could potentially include 47,000 members:

13  approximately 27,000 direct purchasers plus an additional 20,000 indirect purchasers.

14  (Finegan Decl. (Dkt. # 57) ¶ 5 (stating Kroll identified approximately 27,434 direct

15  purchasers); 1/15/23 Davis Decl. (Dkt. # 19) ¶ 5 (estimating 20,000 indirect purchasers).)

16  As discussed in more detail below, nearly all of the direct purchasers received notice of

17  the settlement by mail or email, and Kroll implemented an extensive publicity campaign

18  that included a press release, summary notice in print publications, and online

19  advertisements in an effort to reach indirect purchasers.  (*See infra* Section III.B.)  Kroll

20  reports that 1,117 class members filed claims for relief.  (11/13/23 Supp. at 2.)  Of these,

21  approximately 1,041 claimants received direct notice of the settlement via mail or email.

22

1    (*Id.*)  Kroll's records indicate that nearly 400 claimants purchased Applicable Records

2    both directly from Defendants and indirectly through third-party retailers.  (*Id.*)

3           Claimants filed claims for 12,280 Applicable Records.  (*Id.*)  Claimants chose the

4    Full Refund option for 2,712 records (22.1%); the 5% Refund option for 3,034 records

5    (24.7%); and the 10% Coupon option for 6,534 records (53.2%).  (*Id.*)  Kroll estimates

6    that the total monetary benefit to the Class is $359,810.16.  (*Id.* at 6.)

7           Kroll received four requests for exclusion.  (*See* Fenwick Decl. (Dkt. # 55) ¶ 5, Ex.

8    A (listing the identifiers for the class members who opted out).)  The court received seven

9    objections (*see generally* Objs.), which the court addresses below in context as it reviews

10   the settlement.  *See McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 606 (9th Cir. 2021)

11   (requiring district courts to "give a reasoned response to all non-frivolous objections").

12                          **III.    MOTION FOR FINAL APPROVAL**

13          To grant final approval of a class action settlement, the court must determine that

14   (1) the class meets the requirements for certification under Federal Rule of Civil

15   Procedure 23(a) and (b); (2) notice to the class was adequate; and (3) the settlement

16   reached on behalf of the class is fair, reasonable, and adequate.  *See* Fed. R. Civ. P. 23(e).

17   Where the parties reach a settlement agreement before class certification, the court "must

18   peruse the proposed compromise to ratify both the propriety of the certification and the

19   fairness of the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003); *see*

20   *also In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011)

21   (instructing district courts to apply "an even higher level of scrutiny for evidence of

22   collusion or other conflicts of interest" when evaluating pre-certification settlements).

1     **A.     Certification of the Settlement Class**

2         The court begins by certifying the Class for the purpose of settlement.  Having

3     reviewed the record now before it, the court finds no cause to depart from the reasoning

4     underlying its provisional certification of the Class.  (*See* 5/9/23 Order at 21-24

5     (concluding that the court would likely be able to certify the Class for settlement

6     purposes under Rules 23(a) and 23(b)(3))); *see Juarez v. Soc. Fin., Inc.*, No.

7     20-cv-03386-HSG, 2023 WL 3898988, at *3 (N.D. Cal. June 8, 2023) (certifying a

8     settlement class for final approval when no material changes occurred between

9     preliminary and final certification); *Lalli v. First Team Real Est.-Orange Cnty.*, No.

10    8:20-cv-00027-JWH-ADS, 2022 WL 8207530, at *4 (C.D. Cal. Sept. 6, 2022) (same).

11    Accordingly, the court finds that Plaintiffs have met their burden of showing that the

12    requirements of Rules 23(a) and 23(b)(3) have been met and certifies the Class for the

13    purpose of final approval.

14    **B.     Adequacy of Notice**

15        The court is satisfied that class members received the "best notice that is

16    practicable under the circumstances," Fed. R. Civ. P. 23(c)(2)(B), and that the notice

17    provisions of the Class Action Fairness Act, 28 U.S.C. § 1715 ("CAFA"), were fully

18    discharged.  The court found at preliminary approval that the form of notice fully

19    complies with the requirements of Rule 23(c)(2)(B) and sees no reason to depart from

20    that finding now.  (5/9/23 Order at 6, 26; *see* Agreement, Exs. C (summary notice), D

21    (long-form notice), E (claim form).)  The notice program included the following

22    components:

<u>Direct Mailed Notice:</u>  Kroll used Defendants' records to identify the addresses of 27,434 potential class members who were direct purchasers of Applicable Records. (Finegan Decl. ¶ 5.)  On June 23, 2023, Kroll mailed these potential class members a copy of the long-form notice and claim form via first class mail.  (*Id.* ¶ 7.)  Of these, 876 notices were returned as undeliverable.  (*Id.*)  Kroll was able to identify 661 updated addresses and re-mailed the notice and claim form to those addresses.  (*Id.*)

<u>Direct Emailed Notice:</u>  On June 23, 2023, Kroll emailed summary notice to the 27,143 email addresses it had on file for potential direct-purchaser class members and third-party retail merchants.  (*Id.* ¶ 8.)  Of these, 5,388 emails were rejected or bounced back as undeliverable.  (*Id.*)  Altogether, Kroll estimates that approximately 99.2% of the potential direct-purchaser class members received notice by mail or email.  (Approval Mot. at 4 (citing 10/6/23 Turner Decl. (Dkt. # 59) ¶ 3, Ex. B (Kroll report dated October 1, 2023)).)

<u>Publication in Print Magazines:</u>  Kroll published summary notice in three magazines popular with audiophiles: *Goldmine Magazine*, *Stereophile Magazine*, and *The Absolute Sound Magazine*.  (Finegan Decl. ¶ 10; *see also id.* ¶ 11, Ex. E (tear-sheet proofs of publication).)  Together, these magazines have a circulation of over 107,000. (*Id.* ¶ 11.)

<u>Online Display and Social Media Ads:</u>  Kroll purchased online display ads targeted to the websites for *Goldmine Magazine*, *Stereophile Magazine*, and *The Absolute Sound Magazine*.  (*Id.* ¶ 12; *see also id.*, Ex. F (examples of online display ads).)  It also purchased (1) social media ads on Facebook and Instagram targeted to people who liked,

1   followed, interacted with, or became fans of certain Facebook and Instagram pages,

2   accounts, groups, and hashtags and (2) display ads on "YouTube channels and/or content

3   relevant to vinyl record collectors, original master recordings, audiophiles, Stereophile,

4   and MoFi." (*Id.* ¶¶ 13-16; *see also id.* ¶ 17, Ex. G (examples of social media ads).)  In

5   total, more than 1,500,000 online and social media ad impressions were served.  (*Id.*

6   ¶ 18.)

7       Press Release:  On July 5, 2023, Kroll distributed a press release regarding the

8   Settlement on PR Newswire USA.  (*Id.* ¶ 19; *see id.*, Ex. H (press release and pick-up

9   report).)  The press release resulted in 391 mentions of the settlement in news media.  (*Id.*

10   ¶ 19.)

11      Settlement Website:  The settlement website, www.audiophilesettlement.com,

12   "went live" on June 23, 2023.  (*Id.* ¶ 20.)  The website included a summary of the

13   settlement; key documents related to the settlement; a means to contact Kroll with

14   questions; notice of important deadlines; and a form allowing class members to file

15   claims.  (*Id.*)  The website received over 17,000 unique visitors.  (*Id.*)  Kroll also

16   established a toll-free telephone number that potential class members could call for

17   information about the Settlement.  (*Id.* ¶ 21.)  As of October 4, 2023, 588 individuals had

18   called that number.  (*Id.*)

19      CAFA Notice:  Kroll sent timely notice of the settlement to the United States

20   Attorney General and all state Attorneys General.  (*Id.* ¶ 9, Ex. D (CAFA notice).)

21   //

22   //

1    Based on the foregoing, the court concludes that the notice program, as

2    implemented, provided the "best notice that [was] practicable under the circumstances,"

3    as required by Rule 23(c)(2)(B) and weighs in favor of final approval of the settlement.

4    **C.     Rule 23(e)(2) Analysis**

5    Federal Rule of Civil Procedure 23(e)(2) requires a court to find that a settlement

6    "is fair, reasonable, and adequate" before granting final approval.  Fed. R. Civ. P.

7    23(e)(2).  In making this determination, the court must consider whether:

8    (A)    the class representatives and class counsel have adequately
            represented the class;

9    (B)    the proposal was negotiated at arm's length;

10   (C)    the relief provided for the class is adequate, taking into account:

11       (i)     the costs, risks, and delay of trial and appeal;

12       (ii)    the effectiveness of any proposed method of distributing relief
                 to the class, including the method of processing class-member
                 claims;

13       (iii)   the terms of any proposed award of attorney's fees, including
                 timing of payment; and

14
15       (iv)    any agreement required to be identified under Rule 23(e)(3),
                 [requiring the parties seeking approval to file a statement
                 identifying any agreement made in connection with the
16               proposal]; and

     (D)    the proposal treats class members equitably relative to each other.

17   *Id.*  "To survive appellate review, the district court must show it has explored

18   comprehensively all [Rule 23(e)(2)] factors, and must give a reasoned response to all

19   non-frivolous objections." *McKinney-Drobnis*, 16 F.4th at 606 (quoting *Allen v. Bedolla*,

20   787 F.3d 1218, 1223-24 (9th Cir. 2015)).  District courts examining whether a proposed

21   settlement comports with Rule 23(e)(2) are also guided by the eight "*Churchill* factors."

22

*Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021).  These factors are:  "(1) the strength of

the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further

litigation; (3) the risk of maintaining class action status throughout the trial; (4) the

amount offered in settlement; (5) the extent of discovery completed and the stage of the

proceedings; (6) the experience and views of counsel; (7) the presence of a governmental

participant; and (8) the reaction of the class members to the proposed settlement."

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

The court may not apply a presumption that the settlement was fair and

reasonable, and settlements reached before class certification are subject to "extra

scrutiny."  *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 776 (9th Cir. 2022).

"This more exacting review [helps] to ensure that class representatives and their counsel

do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who

class counsel had a duty to represent."  *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035,

1049 (9th Cir. 2019) (cleaned up).

> 1. <u>Whether the class representatives and class counsel have adequately represented the class under Rule 23(e)(2)(A) and whether the proposal was negotiated at arm's length under Rule 23(e)(2)(B).</u>

Because Intervenors' allegation that the settlement was the result of a collusive

reverse auction implicated both the adequacy of representation and the propriety of the

parties' settlement negotiations, the court addressed Rules 23(e)(2)(A) and (B) together in

its preliminary approval order.  (*See* 5/9/23 Order at 9-14.)  The court does the same in

this order and concludes that Rules 23(e)(2)(A) and (B) favor final approval.

1    In its preliminary approval order, the court rejected Intervenors' argument that the

2    settlement resulted from a collusive reverse auction and found that the parties' settlement

3    was the result of an arm's-length negotiation.  (*See* 5/9/23 Order at 9-14.)  None of the

4    Objectors raised concerns about collusion and the court finds nothing in the record now

5    before it that would call its original finding into question.  (*See generally* Objs.; *see also*

6    *infra* Section III.C.2.d (addressing the *Bluetooth* factors, which require the court to

7    review the settlement for "subtle signs" that the settlement is the result of collusion.  *See*

8    *In re Bluetooth*, 654 F.3d at 947.).)  Therefore, the court incorporates into this order the

9    portion of its preliminary approval order in which it rejected Intervenors' argument that

10   the settlement is the product of a reverse auction and renews its conclusion that the

11   settlement was negotiated at arm's length.  (5/9/23 Order at 9-14.)

12   Second, the court preliminarily approved Mr. Turner and his law firm as class

13   counsel for the purpose of settlement after concluding that the settlement was not a

14   collusive reverse auction and considering counsel's record of effective class action

15   advocacy.  (*See id.* at 9-14, 25.)  None of the Objectors raised any concerns about the

16   adequacy of class counsel (*see generally* Objs.), and the court finds no reason in the

17   record now before it to depart from its original finding.  Therefore, the court finds for

18   purposes of final approval that Mr. Turner and his firm have adequately represented the

19   Class.

20   Third, the court preliminarily appointed Plaintiffs as class representatives based on

21   class counsel's representation that they had provided useful information "about the

22   relevant recordings, the technical aspects of the recording market, and the primary and

secondary markets for the Applicable Records." (5/9/23 Order at 13-14 (citing 1/15/23

Turner Decl. ¶ 6), 25.)  The court also preliminarily concluded that the $10,000 service

awards would "not undermine [Plaintiffs'] adequacy as representatives because the

settlement is not contingent on the court awarding the requested awards and the awards

are not tied to the ultimate class recovery." (*Id.* at 14 (citing *Rodriguez v. West Publ'g*

*Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009)).)  More recently, class counsel stated that:

> Prior to settlement, both Class Representatives assisted [class counsel] in
> understanding the audiophile community, the market for limited-run vinyl
> records, and the manufacturing processes at play in this dispute.  Since
> settlement, they have continued to monitor the status of the notice program
> and remain in close communication and are available to respond to any
> questions or inquiries [class counsel] raise[s].  Their proactive contribution
> to this litigation has been substantial, especially given the reputational risk
> associated with representing a class of over 25,000 individuals.

(7/18/23 Turner Decl. (Dkt. # 50) ¶ 21.)  Mr. Tuttle estimates that he contributed a

minimum of 20 hours to this case and Mr. Collman estimates that he contributed at least

100 hours.  (11/13/23 Supp. at 5-6.)  Based on this information, the court concludes that

Plaintiffs have adequately represented the Class.  Thus, the court finds that Rules

23(e)(2)(A) and (B) weigh in favor of final approval of the settlement.

    2.    <u>Whether the relief provided to the class members is adequate, taking into
account the four Rule 23(e)(2)(C) factors.</u>

The court preliminarily concluded, after considering the Rule 23(e)(2)(C)

subfactors, that the relief the settlement provides to the class is adequate.  (*See* 5/9/23

Order at 14-21.)  Several Objectors, however, have raised concerns about the adequacy of

relief.  (*See generally* Objs.)  "An objector to a proposed settlement agreement bears the

1   burden of proving any assertions they raise challenging the reasonableness of a class

2   action settlement." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 583 (N.D. Cal.

3   2015) (citing *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990)); *see also Sekiya

4   v. Gates*, 508 F.3d 1198, 1200 (9th Cir. 2007) (rejecting objections that contained "[b]are

5   assertions and lists of facts unaccompanied by analysis and completely devoid of

6   caselaw"). The court considers the relevant objections below in the context of its

7   analysis of the Rule 23(e)(2)(C) subfactors. *See McKinney-Drobnis*, 16 F.4th at 606.

8              *a.    General Objections to the Relief Offered*

9       Several Objectors complain in general terms that the compensation the Settlement

10  offers to class members is inadequate. None of these objections, however, sway the court

11  from its initial conclusion that the relief offered is adequate.

12      First, Konstantin Azvolinsky and Mark Allen[3] object that the settlement

13  underestimates the premium that class members paid to purchase triple-analog

14  recordings. (Azvolinsky Obj. (Dkt. # 47); Allen Obj. (Dkt. # 54) at 10-11.) Mr.

15  Azvolinsky argues that the 5% Refund option is inadequate in light of the "price gap"

16  between "regular MoFi" recordings and the higher-priced One-Step recordings and

17  similar high-end recordings sold by other entities. (Azvolinsky Obj.) He asserts that a

18  25% refund would be sufficient. (*Id.*) He does not, however, include any evidence or

19  analysis to support his proposal. (*Id.*) Mr. Allen also argues that the premium class

20  members paid for OMR and One-Step recordings "far exceeded the 5% or 10% offered"

21  _____

22  [3] Mr. Allen is the named plaintiff in *Allen v. Audiophile Music Direct*. (*See supra* Section II.B.)

1    by the settlement.  (Allen Obj. at 10.)  He argues that it "strains credulity to believe that

2    Defendants would have put so much marketing effort to misrepresent to consumers that

3    its titles were all-analog or AAA vinyl reissues and, as they argue, use premium materials

4    for their OMR and [One-Step recordings] to capture only a 5% or 10% premium price."

5    (*Id.*)  To support this assertion, Mr. Allen offers links to pages on MoFi competitor

6    Acoustic Sounds' website, which offers a triple-analog recording of *Pretzel Logic* by

7    Steely Dan for $150.00 and the same album recorded with a digital step for $29.98.  (*Id.*)

8           The court addressed this issue in depth in its preliminary approval order and

9    determined that the higher price of OMR and One-Step recordings was based not only on

10   being marketed as triple-analog but also on factors such as packaging, vinyl quality, and

11   the manufacturing process.  (*See* 5/9/23 Order at 18-19.)  Mr. Azvolinsky and Mr. Allen

12   offer nothing new to alter this conclusion.  Indeed, in the court's view, Mr. Allen's

13   objection *supports* the conclusion that the price difference between MoFi's Silver Label

14   and One-Step recordings cannot be attributed solely to Defendants' representation that

15   One-Step recordings were triple-analog.  (*See id.*)  According to Acoustic Sounds'

16   website, the $150.00 "Ultra High Quality Record" version of *Pretzel Logic* is a

17   limited-edition release on 200-gram clear vinyl with premium packaging, while its

18   $29.98 offering is on 180-gram vinyl and the website says nothing about packaging or

19   whether the release was limited.[4]  Thus, the differences between Acoustic Sounds'

20

21          _____

22          [4] *Compare Steely Dan - Pretzel Logic (45 RPM 200 Gram Clarity Vinyl)*, Acoustic
     Sounds, https://store.acousticsounds.com/d/171037/Steely_Dan-Pretzel_Logic-
     UHQR_Vinyl_Record (last visited Dec. 22, 2023) ($150.00 offering), *with Steely Dan - Pretzel*

1    standard and premium releases that justify the higher price of the premium offering are

2    very similar to the differences between MoFi's Silver Label and One-Step releases.  The

3    court overrules Mr. Azvolinsky and Mr. Allen's objections relating to the price premium

4    associated with triple-analog recordings.[5]

5         Second, Kevin Gashlin objects that the proposed settlement is inadequate because

6    it does not take into account the effect of inflation since class members originally

7    purchased their Applicable Records as many as 15 years ago.  (Gashlin Obj. (Dkt. # 52).)

8    Mr. Gashlin points to no authority that supports his position (*see id.*), and the court is

9    unaware of any case in which a court found class relief inadequate because refunds were

10   not adjusted for inflation.  To the contrary, the court agrees with class counsel that the

11   cumulative effect of inflation has been offset by the value class members have realized by

12   having "had the benefit of having the recordings for all these years."  (10/30/23 Hr'g Tr.

13   (Dkt. # 67) at 13:10-19.)  Therefore, the court overrules Mr. Gashlin's first objection.

14        Third, Mr. Gashlin objects that the settlement does not include compensation for

15   the purchase of shipping containers or insurance for use when returning Applicable

16   Records for a refund.  (Gashlin Obj.)  He is concerned that damage to the records during

17   transit could affect the refund issued.  (*Id.*)  In response, counsel for Defendants

18   represented at oral argument that (1) MoFi will work with Kroll and the claimants in

19

20   *Logic*, Acoustic Sounds, https://store.acousticsounds.com/d/179567/Steely_Dan-Pretzel_Logic-180_Gram_Vinyl_Record (last visited Dec. 22, 2023) ($29.98 offering).

21        [5] Mr. Azvolinsky asks to be excluded from the settlement if the court approves it as is.
     (Azvolinsky Obj.)  Because the court grants Plaintiffs' motion for final approval, the court grants

22   Mr. Azvolinsky's request for exclusion.

1    administering the Full Refund component of the settlement and (2) the audiophiles who

2    purchase records from Defendants are generally accustomed to buying and shipping

3    records and are thus likely to have proper packaging.  (10/30/23 Hr'g Tr. at 28:22.)  The

4    court is satisfied with Defendants' representation that they will assist class members who

5    chose to return their records for a refund.

6           Fourth, Mr. Gashlin also objects that the amount of compensation offered to class

7    members is not enough to have a deterrent effect on Defendants.  (Gashlin Obj.)  Mr.

8    Gashlin does not provide evidence or argument to support this contention, nor does he

9    suggest how much compensation would be sufficient to deter wrongdoing.  (*See*

10   *generally id.*)  *See Quiruz v. Specialty Commodities, Inc.*, No. 17-cv-03300-BLF, 2020

11   WL 6562334, at *8 (N.D. Cal. Nov. 9, 2020) (rejecting objection that the settlement

12   "should be ten times greater" that was "devoid of supporting facts or legal citations")

13   (citing *Young v. LG Chem Ltd.*, 783 F. App'x 727, 737 (9th Cir. 2019)).  In addition,

14   counsel for Defendants represented at oral argument that the damage to Defendants'

15   reputation arising from the alleged misrepresentation and the costs of the settlement have

16   had a substantial deterrent effect and have changed the way Defendants explain how their

17   records are made.  (10/30/23 Hr'g Tr. at 24:18-25:14, 28:23-29:15.)  Therefore, the court

18   also overrules this objection.

19          Finally, Mr. Allen objects that the court must "more carefully scrutinize"

20   settlements that involve coupons as part of the consideration.  (Allen Obj. at 3.)  To

21   support this contention, he cites 28 U.S.C. § 1712—CAFA's coupon settlement

22   provision—and *Knapp v. Art.com, Inc.*, 283 F. Supp. 3d 823, 830 (N.D. Cal. 2017).

1  (Allen Obj. at 3.)  Mr. Allen does not, however, discuss in any detail what that more

2  careful scrutiny should entail, how the court should apply CAFA, or how *Knapp* should

3  inform the court's review of the settlement in this case.  (*See id.*)  In any event, *Knapp* is

4  distinguishable.  That case involved a settlement in which the *only* monetary relief

5  provided to class members was a $10.00 voucher that could be used toward the purchase

6  of any product on the defendants' websites, and the plaintiffs based the value of the

7  settlement on the total cash value of the vouchers, whether they had been redeemed or

8  not.  *Knapp*, 283 F. Supp. 3d at 829, 836.  The court held that it could not determine an

9  attorneys' fee award until it knew the value of the coupons that class members had

10  actually redeemed.  *Id.* at 837-38.  Here, in contrast, class members can select a cash

11  refund rather than a coupon; the court is aware of how many coupons class members

12  have requested and the total value of those coupons; and the coupon option has proven to

13  be the most popular choice among class members who have filed claims.  (*See* 11/13/23

14  Supp. at 2.)  For these reasons, the court overrules this objection.

15         The court concludes by observing that every settlement, by its nature, is the result

16  of compromise.  *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir.

17  1998) ("[T]he very essence of a settlement is compromise, a yielding of absolutes and an

18  abandoning of highest hopes." (internal quotation marks omitted)).  Thus, courts

19  regularly approve class settlements where class members recover far less than the

20  maximum potential recovery.  *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454,

21  459 (9th Cir. 2000) (approving a settlement amount that was approximately one-sixth of

22  the maximum possible recovery); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245,

1    256 (N.D. Cal. 2015) (approving a settlement amount that was approximately 8.5% of the

2    maximum recovery amount).  Here, by contrast, every class member had the opportunity

3    to recover 100% of the amount they paid for their Applicable Records, including tax and

4    shipping.  The court concludes that the amount of the settlement is reasonable.

5               b.       *Rule 23(e)(2)(C)(i)*

6         The first Rule 23(e)(2)(C) factor requires the court to consider "the costs, risks,

7    and delay of trial and appeal."  Fed. R. Civ. P. 23(e)(2)(C)(i).  Only Mr. Allen objects on

8    this ground.  (*See generally* Objs.)  He argues that Plaintiffs have underestimated their

9    risk at trial because Defendants' "liability is more than probable" and explains in detail

10   why he holds this belief.  (*See* Allen Obj. at 4-10.)  The court, however, agrees with

11   Plaintiffs that their primary risk in this case is not in proving liability, but rather in

12   proving that class members suffered damage when many of the Applicable Records have

13   a higher price on the secondary market than their original purchase price.  (Obj. Resp. at

14   5; *see also* 5/9/23 Order at 20-21 (agreeing with Plaintiffs that their key risk at trial is

15   proof of damages); Koloda Obj. (Dkt. # 46) at 1 (pointing out that one of Defendants'

16   One-Step recordings is "going for between $1500.00 and $4000.00 on e[B]ay[, s]imilar

17   to other limited edition issues by" MoFi).)  The court also agrees with Plaintiffs that if the

18   case were to proceed to trial, Defendants would likely argue that class members were

19   "unable to audibly discern between all-analog and digital manufacturing processes, and

20   therefore were not harmed."  (Approval Mot. at 7; *see also* Koloda Obj. at 1-2

21   (questioning whether "these ersatz audiophiles could actually tell the difference between

22   a true analog and a 'tainted' analog product in a blind listening test"); 3/31/23 Davis

1  Decl. ¶ 4 (stating that Defendants "ha[d] not experienced any appreciable loss in sales of

2  OMR and One-Step records . . . since July 27, 2022," when Mr. Davis acknowledged that

3  Defendants had used digital technology in their mastering chain).)  Thus, Mr. Allen's

4  objection does not move the court to depart from its original conclusion that Plaintiffs

5  would likely face substantial risk at trial.  *See, e.g.*, *In re Toys R Us-Del., Inc.--Fair &*

6  *Accurate Credit Transactions Act Litig.*, 295 F.R.D. 438, 454 (C.D. Cal. 2014) (finding

7  that the amount of the settlement weighed in favor of final approval "[g]iven the

8  likelihood that plaintiffs would have been unable to prove actual damages").  The court

9  concludes that Rule 23(e)(2)(C)(i) favors final approval.

10          *c.*          *Rule 23(e)(2)(C)(ii)*

11          The second Rule 23(e)(2)(C) factor requires the court to consider "the

12  effectiveness of any proposed method of distributing relief to the class, including the

13  method of processing class-member claims."  Fed. R. Civ. P. 23(e)(2)(C)(ii).  The

14  proposed method for processing claims "should deter or defeat unjustified claims, but the

15  court should be alert to whether the claims process is unduly demanding."  Fed. R. Civ.

16  P. 23 advisory committee's note to 2018 amendment.  The court preliminarily approved

17  the settlement's methods of distributing relief and processing claims.  (5/9/23 Order at

18  14-20 (concluding that Rule 23(e)(2)(C) favored preliminary approval).)

19          Several objectors complain that the settlement's proof of purchase and proof of

20  ownership requirements are too burdensome, especially for records they purchased years

21  ago.  Omar Ghaffar objects in general that that the burden of gathering proof of purchase

22  and ownership materials outweighs the value of the settlement, and more specifically that

1    he cannot provide proof of purchase for records he bought at an audio show because he

2    was not given a receipt.  (Ghaffar Obj. (Dkt. # 53).[6])  James Luehman complains that he

3    cannot obtain proof of purchase of four records that he purchased eight years ago from a

4    now-defunct retailer.  (Luehman Obj. (Dkt. # 44).)  And Robbie Hewitt asserts that

5    researching his past transactions and associating them with specific records is

6    overwhelming and onerous.  (Hewitt Obj. (Dkt. # 45).)  The court overrules these

7    objections.

8         The court is sympathetic to the difficulty of complying with the proof of purchase

9    requirements, particularly where class members bought their records long ago from

10   third-party retailers.  Nonetheless, the court finds that providing proof of purchase and

11   ownership is necessary to ensure that payment is properly made to individuals belonging

12   to the settlement class.  *See, e.g., Abadilla v. Precigen, Inc.*, No. 20-CV-06936-BLF,

13   2023 WL 7305053, at *12 (N.D. Cal. Nov. 6, 2023) (finding requirement to provide

14   proof of purchase of defendant's stock necessary "in light of the prevalence of fraudulent

15   financial activity"); *Broomfield v. Craft Brew All., Inc.*, No. 17-cv-01027, 2020 WL

16   1972505, at *21 (N.D. Cal. Feb. 5, 2020) (finding age certification provision "necessary

17   to ensure that only those who are legally allowed to purchase Kona Beers received

18   compensation under the Settlement Agreement").  In addition, Defendants' own sales

19   records satisfy the proof of purchase requirement for class members like Mr. Hewitt who

20

21   _____

     [6] Mr. Ghaffar also objects that he does not have receipts for recordings he received as
22   gifts.  (*Id.*)  Recordings transferred from third parties, including gifts, are expressly excluded
     from the settlement.  (*See* 5/9/23 Order at 15-16.)

1    were direct purchasers from Music Direct.  (Agreement ¶¶ 4.23(c)-(d); *see* Hewitt Obj.

2    (stating that he received direct-mailed notice).)  And finally, the Agreement requires

3    Kroll to evaluate proof of purchase and proof of ownership "under liberal term to effect

4    the intent and purpose of the Settlement."  (Agreement ¶¶ 4.23(e), 4.24(c).)  The court

5    overrules the objections to the method of distributing relief and concludes that Rule

6    23(e)(2)(C)(ii) favors final approval.

7                    d.      *Rule 23(e)(2)(C)(iii)*

8           The third Rule 23(e)(2)(C) factor requires the court to consider whether the terms

9    of the award of attorneys' fees favor approval.  Fed. R. Civ. P. 23(e)(2)(C)(iii).  In

10   evaluating the proposed award, the district court should be watchful for "subtle signs"

11   that class counsel and the class representatives permitted self-interest to trump their

12   obligation to ensure a fair settlement for the class as a whole.  *In re Bluetooth*, 654 F.3d

13   at 947; *see also Briseño v. Henderson*, 998 F.3d 1014, 1026 (9th Cir. 2021) (holding that

14   district courts must apply the *Bluetooth* factors even after the 2018 reenactment of Rule

15   23(e)(2)).  These signs are: (1) whether the settlement terms result in class counsel

16   receiving a disproportionate share of the settlement; (2) the presence of a clear sailing

17   provision, under which the defendant agrees not to object to the plaintiff's fee request;

18   and (3) an agreement that unawarded attorneys' fees will revert to the defendant rather

19   than to the class fund.  *In re Bluetooth*, 654 F.3d at 947.

20          The court concludes that the *Bluetooth* factors do not weigh against final approval

21   of the settlement.  First, as discussed in detail below, the court has carefully reviewed the

22   record in this case and finds that Plaintiffs' request for $290,000 in combined attorneys'

fees and costs is not disproportionate to the amount of the settlement.  (*See infra* Section IV.A (approving Plaintiffs' request for attorneys' fees and costs).)  Second, the Agreement does not appear to include a clear sailing provision.  (*See* Agreement ¶ 5.7.1 (saying nothing about an agreement not to object to the fee request).)  Finally, the third sign of collusion—a reversionary provision—is absent from this claims-made settlement. (*See generally id.*)  As a result, the court finds that the *Bluetooth* factors do not warrant a finding of collusion and concludes that Rule 23(e)(2)(C)(iii) favors final approval.

      *e.*  *Rule 23(e)(2)(C)(iv)*

   The fourth Rule 23(e)(2)(C) factor requires the court to consider "any agreement required to be identified under Rule 23(e)(3)"–that is, "any agreement made in connection with the proposal."  Fed. R. Civ. P. 23(e)(2)(C)(iv), 23(e)(3).  No such agreements are at issue in this case.  (*See generally* Agreement.)

   In sum, the court concludes, based on its review of the Rule 23(e)(2)(C) factors, that the relief the settlement provides to the class is adequate.

   <u>3.</u>  <u>Whether the proposal treats class members equitably relative to each other under Rule 23(e)(2)(D).</u>

   Rule 23(e)(2)(D) requires the court to evaluate whether the settlement proposal "treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  The court preliminarily determined that the settlement satisfies Rule 23(e)(2)(D), and reiterates that conclusion here.  (5/9/23 Order at 21.)  Each class member's recovery is based on the records for which that class member provides proof of purchase and ownership, and the form of relief the class member selected for each record.

1    Furthermore, as explained below in Section IV.B, the court finds that the Plaintiffs'

2    requested $10,000 service awards are reasonable and do not affect the equity of the class

3    compensation on the whole.  The court concludes that Rule 23(e)(2)(D), like the other

4    Rule 23(e)(2) factors, weighs in favor of final approval.

5            4.      The *Churchill* Factors

6            Finally, the *Churchill* factors also support final approval of the settlement.  The

7    court considered most of these factors while reviewing the Rule 23(e)(2) factors.  *See*

8    *Briseño*, 998 F.3d at 1026 (noting that many of the *Churchill* factors "fall within the

9    ambit of the revised Rule 23(e)").  The court considers the unaddressed factors below.

10           The court begins with the eighth *Churchill* factor, the reaction of the class, and

11   concludes that this factor favors approval.  As discussed above, the court received only

12   seven objections and four requests for exclusion.  (*See supra* Section II.D.)  Assuming

13   that the class consists of approximately 27,000 direct purchasers and 20,000 indirect

14   purchasers (*see* 11/13/23 Supp. at 3), the result is an objection rate of approximately

15   0.0149% and an exclusion rate of approximately 0.009%.  These rates compare favorably

16   to rates that courts in this Circuit have found support settlement approval.  *See, e.g.*,

17   *Churchill*, 361 F.3d at 577 (affirming the approval of a settlement where the court

18   received 45 objections (0.05%) and 500 opt-outs (0.556%) out of 90,000 class members

19   who received notice); *Rodriguez*, 563 F.3d at 967 (affirming the district court's finding

20   that 54 objections (0.0144%) out of 376,301 putative class members reflected a favorable

21   class reaction); *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal.

22   2010) (approving settlement where 4.86% of the class opted out).  In addition, 1,117

1    claimants out of a potential 47,000-member class results in a claim rate of approximately

2    2.38%.  (*See supra* Section II.D; *see also* 10/30/23 Hr'g Tr. at 7:8-10:3 (questioning

3    counsel about the claims rate).)  This rate, too, compares favorably to claim rates that

4    courts in this Circuit have found satisfactory in claims-made settlements.  *See, e.g.*,

5    *Johnson v. Metro-Goldwyn-Mayer Studios Inc.*, No. C17-0541RSM, 2018 WL 5013764,

6    at *10 (W.D. Wash. Oct. 16, 2018) (approving settlement where only 0.21% of the class

7    participated in the settlement), *aff'd sub nom. Johnson v. MGM Holdings, Inc.*, 943 F.3d

8    1239 (9th Cir. 2019), and *aff'd sub nom. Johnson v. MGM Holdings, Inc.*, 794 F. App'x

9    584 (9th Cir. 2019); *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 321 (N.D.

10   Cal. 2018) (approving claim rate of 1.8%, and discussing class actions against Home

11   Depot and Target with claim rates of approximately 0.2% and 0.23%).  Accordingly, the

12   court concludes that the positive response of the class members supports approval of the

13   settlement.

14        The sixth *Churchill* factor, the experience and views of counsel, also favors

15   approval.  "Parties represented by competent counsel are better positioned than courts to

16   produce a settlement that fairly reflects each party's expected outcome in litigation."

17   *Rodriguez*, 563 F.3d at 967.  Here, class counsel "believe that the Settlement is a

18   'strong' outcome in light of potential risks of continued litigation" and based on the

19   potential compensation offered to class members.  (Approval Mot. at 8.)

20        Finally, the seventh *Churchill* factor, the presence of a governmental participant,

21   does not apply here.  As noted above, Kroll sent timely notice of the settlement pursuant

22

1   to CAFA (*see supra* Section III.B) and none of the recipient Attorneys General sought to

2   intervene in this action (*see generally* Dkt.).

3       In sum, the court finds that (1) the class meets the requirements for certification

4   under Rules 23(a) and (b)(3); (2) notice to the class was adequate; and (3) the settlement

5   reached on behalf of the class is fair, reasonable, and adequate.  *See* Fed. R. Civ. P. 23(e).

6   Therefore, the court grants Plaintiffs' motion for final approval of the class action

7   settlement.

### IV.    MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS

9       Plaintiffs move the court to approve an award of $290,000 in combined attorneys'

10   fees and costs and a $10,000 service award for each Plaintiff.  (*See generally* Fees Mot.)

11   The court grants Plaintiffs' motion.

12   **A.    Attorneys' Fees and Costs**

13       "The touchstone for determining the reasonableness of attorneys' fees in a class

14   action is the benefit to the class."  *Lowery v. Rhapsody Int'l, Inc.*, 75 F.4th 985, 988 (9th

15   Cir. 2023).  District courts "have an independent obligation to ensure that the award, like

16   the settlement itself, is reasonable, even if the parties have already agreed to an amount."

17   *In re Bluetooth*, 654 F.3d at 941.  A district court can employ either of two methods to

18   calculate fees—the lodestar or a percentage of the recovery.  *Kim*, 8 F.4th at 1180.  Under

19   the lodestar method, the district court "multiplies the number of hours the prevailing

20   party reasonably spent on litigation by a reasonable hourly rate to determine a

21   presumptively reasonable fee award."  *Id.*  The court can then adjust the lodestar amount

1    "by an appropriate positive or negative multiplier" to account for factors such as "the

2    quality of representation, the benefit obtained for the class, the complexity and novelty of

3    the issues presented, and the risk of nonpayment." *Id.* at 1180-81 (quoting *In re*

4    *Bluetooth*, 654 F.3d at 941-42).  Under the percentage of the recovery method,

5    meanwhile, "the court simply awards the attorneys a percentage of the [class] fund

6    sufficient to provide class counsel with a reasonable fee." *Id.* at 1181 (quoting *Hanlon v.*

7    *Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998), *overruled on other grounds as*

8    *recognized by Castillo v. Bank of Am.*, 980 F.3d 723, 729 (9th Cir. 2020)).  The court can

9    also adjust this percentage upward or downward.  *In re Apple Inc.*, 50 F.4th at 784.

10   Although courts may employ either method, they "often employ the other method as a

11   cross-check that the award is reasonable." *Id.*; *see also In re Bluetooth*, 654 F.3d at 942.

12       1.    Lodestar

13       Because the settlement's value is based on the claims made by the members of the

14   class rather than on a common fund, the court begins by evaluating class counsel's

15   lodestar.  *See Johnson*, 2018 WL 5013764, at *6, *12 (finding the lodestar method more

16   appropriate where the settlement "did not create a true common fund as it did not

17   establish a single sum for both class compensation and attorneys' fees").

18       To determine a reasonable number of hours, the court must consider "whether, in

19   light of the circumstances, the time could reasonably have been billed to a private client."

20   *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008).  The court may

21   reduce the hours claimed if the "documentation of the hours is inadequate"; "if the case

22   was overstaffed and hours are duplicated"; or "if the hours expended are deemed

1    excessive or otherwise unnecessary." *Chalmers v. City of Los Angeles*, 796 F.2d 1205,

2    1210 (9th Cir. 1986).  As of November 13, 2023, class counsel spent a total of 409.2

3    hours litigating this case.  (11/13/23 Supp. at 5.)  Mr. Turner, Plaintiffs' lead counsel,

4    billed nearly half of these hours.  (*See id.*)  The remaining hours were incurred by Mr.

5    Turner's firm's associates and paralegals.  (*Id.*; *see* 7/18/23 Turner Decl. ¶¶ 6-14

6    (describing the role of each individual who billed time to the case).)  The court has

7    reviewed class counsel's billing records and concludes that counsel's time has been

8    appropriately documented, that counsel has not unduly duplicated efforts, and that the

9    claimed hours are reasonable.  (*See* 7/18/23 Turner Decl. ¶ 16, Ex. 1 (billing records

10   through July 17, 2023).)

11        The "reasonable hourly rate" used in the lodestar "is the rate prevailing in the

12   community for similar work performed by attorneys of comparable skill, experience, and

13   reputation." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008)

14   (internal quotation marks and citations omitted).  The relevant community "is the forum

15   in which the district court sits." *Id.* (citing *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir.

16   1997)).  District judges can also "consider the fees awarded by other judges in the same

17   locality in similar cases," *Moreno*, 534 F.3d at 1115, and rely on their own knowledge

18   and familiarity with the legal market in setting a reasonable rate, *Ingram v. Oroudjian*,

19   647 F.3d 925, 928 (9th Cir. 2011) (per curiam).  Here, class counsel's hourly rates range

20   from $120.00 for work performed by a legal assistant to $565.00 for Mr. Turner's work.

21   (11/13/23 Supp. at 5; *see* 1/15/23 Turner Decl. ¶¶ 9-12 (describing the class action

22   litigation experience of Mr. Turner and his firm); 7/18/23 Turner Decl. ¶¶ 6-14

1   (describing the experience and billing rates of Mr. Turner's associate and legal staff).)

2   Based on the totality of the record and the court's familiarity with the Seattle legal market

3   and the fees awarded by other judges in this District, the court is satisfied that the hourly

4   rates requested here are reasonable.

5         Class counsel represent that their lodestar was $162,053.00 as of November 13,

6   2023.  (11/13/23 Supp. at 5.)  As a result, class counsel's requested attorneys' fees award

7   is approximately 1.79 times the lodestar.  (*Id.*)  A 1.79 multiplier is within the typical

8   range for attorneys' fee awards in the Ninth Circuit.  *See Vizcaino v. Microsoft Corp.*,

9   290 F.3d 1043, 1051-54 & n.6 (9th Cir. 2002) (noting that the majority of fee awards in

10  the district courts in the Ninth Circuit are 1.5 to 3 times higher than the lodestar).  Based

11  on the record before it, the court concludes that a 1.79 multiplier is reasonable based on

12  the quality of representation, the benefit obtained for the class, the issues presented, and

13  the contingent nature of this action.  *See Kim*, 8 F.4th at 1180-81.

14      2.    <u>Percentage of Recovery Cross-Check</u>

15        In performing a cross-check against the percentage of recovery, the court must

16  consider the settlement's "actual or anticipated value to the class members, not the

17  maximum amount that hypothetically could have been paid to the class."  *Lowery*, 75

18  F.4th at 988-89; *Kim*, 8 F.4th at 1181 (reversing a fee award because the district court

19  failed to consider "the amount of anticipated monetary relief based on the timely

20  submitted claims.").  In common fund cases, the benchmark for a reasonable fee award is

21  25% of the fund.  *In re Bluetooth*, 654 F.3d at 942.  Where the settlement is not based on

22  a common fund, the court can cross-check the lodestar against a "constructive fund"

based on the amount the defendant is spending to resolve the case. *See id.* at 945 (comparing the lodestar against a constructive fund consisting of attorneys' fees, incentive awards, a *cy pres* award, and administrative costs); *see also Lennartson v. Papa Murphy's Int'l LLC*, No. C15-5307RBL, 2018 WL 4252039, at *2 (W.D. Wash. Sept. 6, 2018) (including administrative costs in the court's calculation of the total class benefit in a claims-made settlement); *Staton*, 327 F.3d at 975 (holding that where the defendant pays the justifiable cost of notice to the class, it is reasonable to include that cost in a putative common fund benefiting the plaintiffs for all purposes); *Johnson*, 2018 WL 5013764, at *10 (calculating a constructive common fund based on attorneys' fees, costs, and service award).

Here, the constructive fund created by the settlement totals at least $830,000, comprised of approximately $360,000 in class relief (11/13/23 Supp. at 6); $160,000 in administrative costs incurred to date (*id.* at 7 (citing 11/13/23 Madonia Decl. (Dkt. # 71) ¶¶ 2-3); $290,000 in requested attorneys' fees and costs (Agreement ¶ 5.7.1); and $20,000 in requested service awards (*id.* ¶ 5.7.2). Plaintiffs' proposed $290,000 fees and costs award represents approximately 35% of that total. Although this percentage is higher than the 25% benchmark, it is not so high, in the court's view, as to render the requested fee award unreasonable. *See, e.g.*, *Paredes Garcia v. Harborstone Credit Union*, No. C21-5148LK, 2023 WL 7412842, at *8 (W.D. Wash. Nov. 9, 2023) (awarding fees constituting 41% of the "total cash going toward settlement"); *Lalli*, 2022 WL 8207530, at *6 (finding an award of attorneys' fees and costs constituting 43% of the total settlement fund "steep, but not necessarily disproportionate"); *Johnson*, 2018 WL

1    5013764, at *10 (awarding fees constituting 54.81% of the constructive fund).  The court

2    concludes that the percentage of recovery cross-check supports approval of Plaintiffs'

3    attorneys' fees motion.[7]

4        4.    Costs

5        The court also concludes that class counsel's claimed costs are reasonable.  Class

6    counsel may recover reasonable expenses that "would normally be charged to a fee

7    paying client."  *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (quoting *Chalmers*,

8    796 F.2d at 1216 n.7.  Class counsel represent that they incurred $2,157.44 in litigation

9    costs through November 13, 2023.  (11/13/23 Supp. at 5; *see also* 7/18/23 Turner Decl.

10   ¶ 23, Ex. 2 (cost records through July 18, 2023).)  The costs are included in the $290,000

11   fees award, and thus do not affect the relief received by the Class.  (*See* Agreement

12   ¶ 5.7.1.)  The court has reviewed the costs incurred by class counsel and finds that they

13   were reasonable, necessary, and the types of costs normally charged to a paying client.

14   Therefore, the court approves Plaintiffs' request for a combined award of $290,000 in

15   attorneys' fees and costs.

16   //

17   //

18

19        [7] The court notes that the constructive fund totals approximately $772,000 if the value of
     the 10% Coupon option is subtracted from the class relief.  (*See* 11/13/23 Supp. at 2 (stating that
20   the total base value of the 10% Coupon option is $48.418.99, based on class members'
     selections), 6 (stating that $4,962.95 in taxes and $4,363.64 in shipping costs are attributable to
21   the 10% Coupon option).)  The proposed $290,000 fees and costs award represents
     approximately 37.6% of that total.  Thus, even if the court does not include the value of the
22   coupons in the constructive fund, *see Knapp*, 23 F. Supp. 3d at 838, the percentage of the fund
     attributable to attorneys' fees and costs is still within the range that courts have found reasonable.

1    **B.    Service Awards**

2            Finally, the court grants Plaintiffs' request for a $10,000 service award for each

3    class representative.  Service awards are commonplace in class actions and are "intended

4    to compensate class representatives for work done on behalf of the class, to make up for

5    financial or reputational risk undertaken in bringing the action, and, sometimes, to

6    recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at

7    958-59.  When evaluating the propriety of such payments, district courts consider, among

8    other factors, "'the actions the plaintiff has taken to protect the interests of the class, the

9    degree to which the class has benefitted from those actions, the amount of time and effort

10   the plaintiff expended in pursuing the litigation,' and any financial or reputational risks

11   the plaintiff faced." *In re Apple Inc.*, 50 F.4th at 786 (quoting *SFBSC Mgmt., LLC*, 944

12   F.3d at 1057).  "[D]istrict courts must be vigilant in scrutinizing all incentive awards to

13   determine whether they destroy the adequacy of the class representatives." *Radcliffe v.*

14   *Experian Info. Sols., Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).  Service awards are less

15   likely to create conflicts between the named plaintiff and absent class members when

16   (1) there is no *ex ante* agreement between the class representative and class counsel

17   regarding the award; (2) the discretion to make an award is left to the district court; and

18   (3) the awards are not conditioned on the class representative's support for the settlement

19   agreement.  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015).

20   In the Ninth Circuit, a $5,000 service award "is presumptively reasonable." *McDonald v.*

21   *CP OpCo, LLC*, No. 17-CV-04915-HSG, 2019 WL 2088421, at *7 (N.D. Cal. May 13,

22   2019) (compiling cases).

1    The court preliminarily concluded that the proposed $10,000 awards were

2    reasonable and did not undermine Plaintiffs' adequacy as class representatives "because

3    the settlement is not contingent on the court awarding the requested awards and the

4    awards are not tied to the ultimate class recovery." (5/9/23 Order at 14 (citing *Rodriguez*,

5    563 F.3d at 958-59); *see also* Agreement ¶ 5.7.2.)  Since then, class counsel has provided

6    additional information about the actions Plaintiffs have taken to assist in the prosecution

7    of this case. (*See supra* Section III.C.1; *see also* Fees Mot. at 16 (noting that Plaintiffs

8    risked "reputational harm among the audiophile community" by pursuing this action).)

9    Although a $10,000 service award is twice the benchmark, it is not an unreasonable

10   amount considering the service Plaintiffs have provided to the class and the potential for

11   reputational harm. *See, e.g.*, *McDonald*, 2019 WL 2088421, at *8 (rejecting a request for

12   a $15,000 service award but concluding that an award of $10,000—"twice the

13   presumption"—was reasonable to compensate the class representative for his

14   involvement in the lawsuit and the reputational risk he incurred).  In addition, courts in

15   this District have approved service awards of $10,000 or more. *See, e.g.*, *Wilson v.*

16   *Huuuge*, No. C18-5276RSL, 2021 WL 512229, at *2 (W.D. Wash. Feb. 11, 2021)

17   (approving a $10,000 service award); *Reed v. Light & Wonder, Inc.*, No. C18-0565RSL,

18   2022 WL 3348217, at *2 (W.D. Wash. Aug. 12, 2022) (same); *Lennartson*, 2018 WL

19   4252039, at *2 (awarding $15,000 to each class representative).  The court concludes that

20   the $10,000 service awards requested are reasonable.

21   The court received one objection relating to the service awards.  Richard J. Koloda

22   objects to the court awarding Plaintiffs $10,000 each while they are still allowed to keep

1 their allegedly "defective" records. (Koloda Obj. at 1-2.) He thinks it is unfair that

2 Plaintiffs are "permitted to retain a valuable product that will only increase as an asset"

3 and finds it "disconcerting" that Plaintiffs only filed their complaint after Defendants

4 acknowledged that the Applicable Records included a digital processing step. (*Id.* at 2

5 (pointing out that the quality of the recordings is excellent and that the allegedly "tainted"

6 records have been well-received for years).) As class representatives, however, Mr.

7 Tuttle and Mr. Collman are entitled to receive the benefit of the settlement they helped to

8 obtain. Therefore, the court overrules Mr. Koloda's objection and grants Plaintiffs'

9 request for a $10,000 service award for each class representative.

10                       **V.   CONCLUSION**

11        For the foregoing reasons, the court GRANTS Plaintiffs' motions for final

12 approval of the parties' class action settlement (Dkt. # 56) and for attorneys' fees, costs,

13 and class representative service awards (Dkt. # 49). The court ORDERS as follows:

14        1.      The parties' proposed class action settlement is APPROVED;

15        2.      Plaintiffs' request for an award of $290,000 in combined attorneys' fees

16 and costs is GRANTED;

17        3.      Plaintiff's request for $10,000 service awards for class representatives

18 Stephen J. Tuttle and Dustin Collman is GRANTED;

19        4.      The Parties are DIRECTED to proceed with the settlement payment

20 procedures specified in the settlement Agreement;

21        5.      Defendants are DIRECTED to fund the settlement;

22

1     6.     The Settlement Administrator is AUTHORIZED to distribute the settlement

2 funds;

3     7.     The Settlement Administrator is DIRECTED to distribute the attorneys'

4 fees and service awards as provided in this order;

5     8.     The court RESERVES jurisdiction over the parties as to all matters relating

6 to the administration, consummation, enforcement, and interpretation of the settlement

7 Agreement, this order; and for any other necessary purposes;

8     9.     The settlement Agreement is given full force and effect, and the Released

9 Claims of the class representatives and individual settlement class members, as

10 articulated in the settlement Agreement, are released and forever discharged; and

11     10.     This action is DISMISSED in its entirety with prejudice.

12     Dated this 26th day of December, 2023.

13

14

15 JAMES L. ROBART
United States District Judge

16

17

18

19

20

21

22

ORDER - 39